Leonard KIRK, et al., Plaintiffs,

v.

**TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, et al., Defendants.**

Civil Action No. H–94–0181.

United States District Court, S.D. Texas, Houston Division.

Dec. 22, 1995.

Henry Clay Moore, Houston, TX, for Leonard Kirk, David Gollinger, John Nmi Parker, Sammie Davis, Wayne Jackson.

Eric H. Nelson, Houston, TX, for Transport Workers Union of America, AFL–CIO and Local 260, Frank McCann, John Bland, Billy Prince, Harry Winters, Charleston Campbell.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

Pending before the Court are **Defendants' Motion for Summary Judgment** (Doc. # 40) and **Plaintiffs' Motion for Interlocutory Summary Judgment** (Doc. # 41). The Court has considered these motions together with the applicable authorities and all opposition filed and finds that (1) Defendants' Motion is **GRANTED IN PART AND DENIED IN PART;** and (2) Plaintiffs' Motion is **DENIED.**

### I. *Factual Background*

Plaintiffs Leonard Kirk, David Gollinger, John Parker, Sammie Davis and Wayne Jackson are members and former officers of the Transport Workers Union of America, AFL–CIO, and Local 260 ("Local Union"). Plaintiffs have sued the Transport Workers Union of America, AFL–CIO ("International Union"), the Local Union, and five union representatives affiliated with the administratorship imposed by the International Union in 1992: Frank McCann, Administrator for the Local Union; John Bland, Assistant Administrator; and Charleston Campbell, William Prince and Harry Winters, staff/grievance representatives for the Local Union during the period of the administratorship. Plaintiffs allege violations of the Local Union Bylaws, the International Constitution and the Labor–Management Reporting & Disclosure Act, 29 U.S.C. § 401 *et seq.* ("LMRDA"); breach of the Union's duty of fair representation; fraud; conspiracy; defamation of character; slander; libel; retaliation; suppression of freedom of expression by a labor union; unfair labor practice; breach of contract and breach of a collective bargaining agreement; and tortious interference with contract rights.

On or about October 16, 1992, the International Union imposed an administratorship on the Local Union in accordance with its Constitution, based upon allegations of improper conduct by the Local Union's President, David Carrington, and Secretary–Treasurer, Robert Moreland. An International Vice President based in New York, Frank McCann was appointed Administrator of the Local Union. Because McCann appears to have remained in New York during the tenure of the administratorship, John Bland, the Assistant Administrator, oversaw the union's day to day affairs in Houston. Campbell, Prince and Winters also assisted McCann in this regard.

After imposition of the administratorship (also known as a trusteeship or receivership), various factions within the Local Union began vying for leadership, and each publicized its views on union affairs.

Plaintiffs represented a faction which became known as "New Direction." The individually named Defendants represented the faction loyal to the International and the Administration. The former Local Union president, David Carrington, and his supporters represented the third faction.

Plaintiffs published various newsletters critical of the receivership and of the collective bargaining agreement which McCann negotiated with Plaintiffs' employer, the Metropolitan Transit Authority ("Metro"), targeting alleged irregularities in the contract ratification election held by mail-in ballot in late 1992–early 1993.

In October 1993, Defendants published a newsletter entitled "Enough is Enough," which Plaintiffs allege contained "false, scandalous, slanderous and defamatory material regarding Plaintiffs' previous works as union officers and representatives." Plaintiffs' Second Amended Complaint, at 6. Plaintiffs appear to complain of another allegedly libelous publication in their Reply to Defendants' Supplemental Motion for Summary Judgment. In August 1993, prior to the publication of the "Enough is Enough" Newsletter, a newsletter entitled "Send New Direction on Out the Door!" ("Out the Door" newsletter) was distributed to the Local membership.[1] In apparent reference to Plaintiffs, the "Out the Door" newsletter declared that "those people who have hurt the cause and members are having to answer for their crimes.... These individuals, as past officers of this Local, are the same pillaging individuals that the [Texas Employment Commission] is telling to go home."

Within six months of publication of the "Enough is Enough" newsletter, the Local Union was removed from receivership and an election was held for new officers. Plaintiffs allege that they each ran for an executive office or seat on the executive board. All but one were defeated. Plaintiffs further allege that, as a result of publication of the "Enough is Enough" newsletter, Plaintiffs "lost numerous votes in [the Union] election due to lack of information [2] and misinformation given to the Local 260 membership by the Defendants." Plaintiffs' Second Amended Complaint, at 14.

Plaintiffs contend that they suffered the loss of the good will and respect of the membership of the Local and will not have the opportunity to run for election to executive office or the executive board until April 1997.[3] Because injunctive relief as well as

1. Plaintiffs' complaint is unclear; it appears to complain only of the "Enough is Enough" newsletter and does not indicate that two publications form the basis of Plaintiffs' suit against Defendants. However, in their Reply to Defendants' Motion, Plaintiffs assert that "[t]he summary judgment record should be clear that Plaintiffs allege not one, but two libelous publications by the Receivership, the "On Out the Door" newsletter (Defendants' Second Amended Initial Disclosure, Exh. No. 74) and the "Enough" newsletter (Defendants' Second Amended Initial Disclosure, Exh. No. 62)." Plaintiffs' Reply to Defendants' Supplemental Motion for Summary Judgment, at 1.

2. Plaintiffs claim that the Local Union membership was not informed of grievances which they filed against the Receivership.

3. Plaintiffs earlier maintained that their "only adequate remedy will be through the exercise by the Court of its equitable power to issue its mandatory injunction for the holding of a special election for the executive offices and executive board of Local 260." Plaintiffs' Second Amended Complaint, at 15. Inconsistently, however, Plaintiffs more recently asserted that they "are not moving to establish or set aside a trusteeship or to invalidate an election, as such. Rather, their causes of action are under title I [of the

damages are available under Title I of the LMRDA,[4] it is not clear whether Plaintiffs are seeking to amend their complaint to seek only damages from Defendants. The Court relies on Plaintiffs' most recent statements that they "are not moving to invalidate an election" as a judicial admission that Plaintiffs are no longer seeking the equitable remedy of a special election.

## II. *Summary Judgment Standard*

■ In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, and answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Bozé v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *Bozé,* 912 F.2d at 804, *citing Reid v. State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986).

■ The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue; however, the movant need not negate the elements of the nonmovant's case. *Little,* 37 F.3d at 1075. For issues on which the nonmovant bears the burden of proof at trial, "the movant may merely point to the absence of evidence and thereby shift to the nonmovant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The nonmovant must then identify specific evidence in the summary judgment record which demonstrates a material fact issue concerning the essential elements of its case. *Douglass v. United Serv. Auto. Ass'n,* 65 F.3d 452, 459 (5th Cir.1995); *Little,* 37 F.3d at 1075; *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Douglass,* 65 F.3d at 459; *Little,* 37 F.3d at 1075. Furthermore, in the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *Little,* 37 F.3d at 1075, *citing Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990).

## III. *Legal Analysis*

### 1. *"Out the Door" Newsletter Claims*

■ Plaintiffs allege that Defendants authored the "Out the Door" newsletter. The parties' summary judgment evidence fails to show a genuine issue of material fact as to this newsletter's authorship, despite voluminous submissions.

The affidavit of Archie Thomas (now deceased), submitted to an internal union committee established to investigate Plaintiffs' charges against Defendant John Bland, asserts that Archie Thomas authored the "Out the Door" newsletter; that the newsletter was not published at the request or behest of John Bland; that John Bland did not provide union stationery to publish the newsletter; that the newsletter was not sanctioned or supported by union officials; that no official seal, nor union officials' phone number or address was contained in the newsletter; and that the union emblem appearing at the top of the newsletter was taken from a card with Thomas's name on it. The supplemental affidavits of John Bland, Charleston Campbell, Billy Prince and Harry Winters aver that

LMRDA] for violation of their guarantee of equal voting and participation rights, and improper disciplinary action by the Receiver." Plaintiffs' Reply to Defendants' Supplemental Motion for Summary Judgment, at 5.

4. Pursuant to § 412 of the LMRDA, "[a]ny person whose rights secured by the provisions of [Title I] may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate."

none of these defendants prepared or distributed the "Out the Door" newsletter.

The summary judgment record reveals that the "Out the Door" and "Enough is Enough" newsletters are also visibly different in appearance. For instance, on the "Enough is Enough" newsletter, which Defendants admittedly were involved in preparing, there is a "Transport Workers Union Local 260" logo at the top of page one, the Local's address and phone number are printed across the top and bottom of the newsletter, and the final segment of the newsletter is signed, "John W. Bland, International Representative." The "Out the Door" newsletter in contrast contains a poor reproduction of the union emblem, and neither the union logo nor the Local Union's address or phone number is included. The letter is signed, not by a union official, but by "The Concerned Members to Save Our Union, Archie Thomas and Paul Roushion."

Plaintiffs have the burden at trial of proving that Defendants were the authors of the newsletters of which they complain or that Defendants were responsible for the newsletters, if Plaintiffs are to recover under any of their theories for damages. Thus, once Defendants have submitted admissible evidence that they were not associated with the August 1993 newsletter ("Out the Door"), Plaintiffs have the burden of submitting competent summary judgment evidence which contradicts this proof.

Plaintiffs allege, on the basis of Leonard Kirk's affidavit, that the "Out the Door" newsletter was published by a "nonexistent front for the Receivership." Plaintiffs' Reply to Defendants' Supplemental Motion for Summary Judgment, at 1. However, the Kirk affidavit does not raise a genuine fact question concerning the authorship of the "Out the Door" newsletter. Kirk asserts without any factual detail or apparent basis that the "concerned [union] members" who signed the "Out the Door" newsletter "were closely associated with and backed the Receivership," and that "[n]o such organization existed or was involved in any other activity

regarding Local 260." Plaintiffs also allege that John Bland assisted the authors in using the name of the Local Union and the union emblem "for publishing a misleading and slanderous Local 260 newsletter entitled 'Send New Directions On Out the Door,' designed to cast dispersion [sic] on constitutional delegates L.C. Kirk and David Gollinger ..." Defendants' Second Amended Initial Disclosure Exhibit No. 69, appended to Plaintiffs' first Supplement to Motion for Interlocutory Summary Judgment.

Plaintiffs' allegations respecting Bland's ties to the "Out the Door" newsletter are merely conclusory. Therefore, Plaintiffs do not satisfy their summary judgment burden of designating specific facts showing that there is a genuine question issue for trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). **Defendants' Motion for Summary Judgment is GRANTED as to all claims respecting the "Out the Door" newsletter.** *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994), *quoting Armstrong v. City of Dallas,* 997 F.2d 62 (5th Cir.1993) (summary judgment is appropriate in any case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant").[5]

### 2. *Violation of Local Union Bylaws*

Plaintiffs allege violations of the Local Union bylaws but fail to specify which bylaw(s) was violated or how Defendants' conduct constituted a violation(s). However, Defendants' summary judgment evidence establishes that, during the administratorship, the Local Union bylaws were suspended and the Local Union was governed in accordance with the International Union Constitution. Affidavit of Frank McCann, ¶ 21; Affidavit of John Bland, ¶ 3. Plaintiffs offer no evidence to rebut this assertion. Therefore, **Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' claims regarding violations of the Local Union bylaws.**

5. In any event, the Court's holdings as to the "Enough is Enough" newsletter are equally applicable to the "Out the Door" publication, which immediately preceded the August 1993 election of a delegate to the International Union's convention.

### 3. *Violation of the International Union Constitution*

█ In connection with publication of the "Enough is Enough" newsletter, Plaintiffs allege numerous violations by Defendants of the International Union Constitution ("Union Constitution"), including maliciously publishing or circulating among the membership false reports or misrepresentations, in violation of Article XIX, section 5(e).[6] Plaintiffs argue that these violations should have resulted in union disciplinary proceedings against Defendants and that Defendants' refusal to institute such proceedings allows Plaintiffs to bring suit in federal court.

Defendants argue that Plaintiffs have no federal cause of action for violation of the Union Constitution since the conduct complained of is protected activity. Defendants cite case law for the proposition that, even if defamatory or malicious, the "Enough is Enough" newsletter is protected under § 101(a)(2) of the LMRDA, which guarantees every member of a labor organization

> the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views upon candidates in an election of the

labor organization or upon any business properly before the meeting, subject to the organizations's established and reasonable rules pertaining to the conduct of meetings.

29 U.S.C. § 411(a)(2). Defendants further argue that, because union members may not be disciplined for exercising their free speech rights under the LMRDA, 29 U.S.C. § 529; *see also Keeffe Brothers v. Teamsters Local Union No. 592*, 562 F.2d 298, 304 (4th Cir. 1977) (a union may not discipline a member because he has made a false and libelous charge of robbery and embezzlement by a union officer), they cannot be disciplined for communicating matters of union importance or union business to the Local membership.

█ When the "Enough is Enough" newsletter was published, Defendants held leadership positions in the union receivership. As rank-and-file union members, Plaintiffs were not in a position to "discipline" Defendants within the meaning of the LMRDA.[7] Therefore, the Court is not persuaded that Plaintiffs are using union disciplinary procedures to punish Defendants for publishing union business. Moreover, filing internal union charges or, indeed, a lawsuit in federal court, does not constitute "discipline"

---

6. Article XIX of the Union Constitution enumerates conduct unbecoming a member which may result in disciplinary action by the Local Union. In addition to their claim under section 5(e), Plaintiffs allege violations of the following provision of article XIX: section 5(a) (violation of the Union Constitution, any collective bargaining agreement, or any working rule of the Local Union); section 5(g) (willfully wronging a member of the International Union); section 5(I) (fraudulently receiving any money due to the organization or misappropriating the monies of the organization); section 5(k) (using the name of the Local Union or of the International Union, or its emblem, for any unauthorized purpose); and section 5(*o*) (by act, omission or conduct prejudicing or damaging the interests and welfare of the International Union or the Local Union).

Plaintiff Wayne Jackson alleges that article 5, section 4 of the Union Constitution was violated by the imposition of the receivership. Jackson deposition, at 13. However, it does not appear that, collectively, Plaintiffs are urging this claim. Plaintiffs jointly contend that the action taken by the International President pursuant to article V, section 4 of the Union Constitution (the International President filed charges against the Local

Union which led to the imposition of the receivership) has "no relevancy to the issues of this lawsuit." Plaintiffs' Response to Defendants' Motion for Summary Judgment, at 2. The Court therefore deems Plaintiffs' assertion a judicial admission that Plaintiffs have not alleged a violation of article V, section 4 of the Union Constitution.

7. Union members may not be disciplined by any labor organization, officer, agent, shop steward, or other representative or employee for exercising their free speech rights under the LMRDA. 29 U.S.C. § 529. When the "Enough is Enough" newsletter was published, however, Plaintiffs did not hold leadership positions with the Local Union. Conversely, Plaintiffs were members of the class whom Congress sought to protect in adopting the LMRDA's bill of rights, i.e., rank-and-file union members. *See Finnegan v. Leu*, 456 U.S. 431, 436–37, 102 S.Ct. 1867, 1870–71, 72 L.Ed.2d 239 (1982). As unelected leaders installed by the International Union, Defendants were more closely aligned than Plaintiffs with union government and (as Plaintiffs' complaint indicates) themselves vulnerable to charges of violating § 529. *But see infra* section III(5), as to common law libel and slander issues between union officials and members.

within the meaning of the LMRDA. As Defendants themselves point out, discipline under the LMRDA refers to punishment that a union may impose by virtue of its authority over union members. *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 91–92, 110 S.Ct. 424, 438–39, 107 L.Ed.2d 388 (1989). *See infra* Section III(4). Therefore, regardless of whether the "Enough is Enough" newsletter is protected activity under the LMRDA, § 529 does not preclude Plaintiffs from asserting claims under the Union Constitution in connection with the "Enough is Enough" newsletter.

■ Provided that internal union remedies have been exhausted,[8] union members may assert violations of union constitutions in federal court. *See, e.g., Moore v. Local Union 569 of the Int'l Brotherhood of Elec. Workers*, 989 F.2d 1534, 1539 (9th Cir.1993), *cert. denied*, 510 U.S. 1117, 114 S.Ct. 1066, 127 L.Ed.2d 385 (1994) (jury awarded plaintiff damages on LMRDA claims, assault and battery claims, and claim that local union breached the union's bylaws and the International constitution).

Plaintiffs allege that they filed charges against the individual defendants under Article XIX of the Union Constitution for publishing both the "Out the Door" and "Enough is Enough" newsletters, but that no action was taken by the International on either one. Defendants Second Amended Initial Disclosure Exh. Nos. 69, 78 and 80; affidavit of Leonard Kirk, at 8.[9] Defendants respond that Plaintiffs' charges concerning the "Out the Door" newsletter were heard by an internal union committee. Defendants' Response to Plaintiffs' Reply to Defendants' Supplemental Motion for Summary Judgment, at 2. Defendants have submitted no controverting evidence on the "Enough is Enough" newsletter.

On the basis of Plaintiffs' summary judgment evidence, the Court finds that Plaintiffs have exhausted internal union remedies with respect to the Union Constitution violations alleged concerning the "Enough is Enough" newsletter, which is the only publication that the Court finds otherwise actionable. Thus, publication of the "Enough is Enough" newsletter may form the basis of a suit in federal court, and **Defendants Motion for Summary Judgment is DENIED with respect to Plaintiffs' claims under the Union Constitution.**

### 4. *Violations of the Labor–Management Reporting & Disclosure Act*

Plaintiffs allege that Defendants' publication of the "Enough is Enough" newsletter was intended to suppress and did, in fact, suppress the freedom of expression guaran-

---

8. Plaintiffs must exhaust internal union remedies in order to file suit against Defendants in federal court. Article XIX of the Union Constitution provides that a charge by a member or members in good standing that a member or members have violated the International Constitution must be submitted in writing to the Recording Secretary of the Local Union within sixty (60) days of the time the complainant first became aware, or reasonably should have been aware, of the alleged offense. Upon charges being submitted, it is mandatory that a trial be held unless the charges are withdrawn by the accuser or considered by the Local Executive Board to be improper. *See also Kennedy v. General Truck Drivers, Chauffeurs and Helpers, Local Union No. 692*, 435 F.Supp. 277, 278 (C.D.Cal.1977) (under constitution of international union, terminated employees were required to exhaust internal union remedies before bringing suit against local and international unions and officers of local); *Rizzo v. Ammond*, 182 F.Supp. 456, 470 (D.N.J.1960) (members of a local union in accepting membership in the international and in the local must be deemed to have subjected themselves to the pro-

visions of the constitution and bylaws of the international and remedies for review provided by the international constitution must be exhausted before a federal district court may be called upon for relief under this section).

9. Exhibit No. 69 is a copy of a letter from Plaintiffs dated September 26, 1995, apparently addressed to the Local or International Union (the letter contains no salutation), which charges John Bland with assisting the authors of the "Enough is Enough" newsletter with using the name and emblem of the Local Union for an unauthorized purpose, in violation of Article XIX, section 5(k) of the Union Constitution. Exhibit No. 78 is a copy of a letter from Plaintiffs dated November 27, 1993, seemingly addressed to Frank McCann, which charges McCann and John Bland with numerous violations of the Union Constitution in connection with the "Enough is Enough" newsletter. Exh. No. 80 is a letter from Frank McCann to John Parker dated November 30, 1993, acknowledging receipt of Plaintiffs' letter of November 27, 1993 and indicating that McCann was reviewing the charges.

teed Plaintiffs by the LMRDA, 29 U.S.C. §§ 411(a)(2) and 529. As discussed in the preceding section, union members may not be disciplined for exercising their free speech rights under the LMRDA. The LMRDA, 29 U.S.C. § 529, specifically prohibits discipline of union members by labor organizations for the exercise of rights guaranteed by that Act:

> [i]t shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter.

Plaintiffs argue that publication of the "Enough is Enough" newsletter constituted discipline or retaliation against Plaintiffs for expressing their views on union matters in the "New Direction" newsletters. While Plaintiffs concede that Defendants have not fined, suspended or expelled them, Plaintiffs contend that they were "otherwise disciplined" by Defendants' publication of the "Enough is Enough" newsletter.

 The Court is unpersuaded. The publication by officers of a union newsletter does not constitute "discipline" within the meaning of the LMRDA. In *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989), the United States Supreme Court found that

> by using the phrase 'otherwise discipline,' Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment

authorized by the union as a collective entity to enforce its rules. "Discipline is the criminal law of union government." [citations omitted]. The term refers only to actions "undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership." *Miller v. Holden*, 535 F.2d 912, 915 (5th Cir.1976).... "[D]iscipline" refers to punishment that a union can impose by virtue of its own authority over its members.

*Id.* at 91–92, 110 S.Ct. at 438–39.

 From *Breininger* we learn that "discipline" refers to forms of punishment imposed by union government. There was no union discipline in this case. In publishing the "Enough is Enough" newsletter, the receivership did not attempt to enforce any rules against Plaintiffs. Nor did the union bring its collective or punitive force to bear. That Plaintiffs' free speech rights were allegedly suppressed by the "Enough is Enough" newsletter does not confer on Plaintiffs a cause of action under federal law. **Summary judgment is therefore GRANTED in Defendants' favor as to Plaintiffs' claims under the LMRDA.**

### 5. *Defamation of Character, Slander and Libel*

 Plaintiffs allege that the "Enough is Enough" newsletter contained defamatory statements concerning their purported alliance with the prior (and subsequently discredited) Local Union administration, and that Defendants intentionally published the newsletter with reckless disregard for the truth.[10] As Plaintiffs' allegations suggest, in

---

**10.** The complained of statements are as follows:

(a) "WANTED Desperadoes L.C. Kirk, Sammie Davis, John Parker, Wayne Jackson, Davis (sic) Gollinger."

(b) "Where are the many cellular telephones and beepers which this union had to pay for?"

(c) "Where are the expense monies which were used for non-union business and personal pleasures?"

(d) "What we did find was the PIP was set up by management for union busting tactics and *David Gollinger*, who was on the program, was there to help management disband the union. Mr. Gollinger was selling the union out and was not

wanted by the membership as a union steward. The factotum council was part of management to circumvent the Union from handling union problems. The spying was not discontinued but only put on hold by management."

(e) "*Wayne Jackson, Sammie Davis, and John Parker* were only riding around with the company and selling the membership out with mobile phones paid for by this union."

(f) "The international would not have come in and taken over if *New Directions* had their business financially and procedurally sound."

(g) "*Sammie Davis, Wayne Jackson and John Parker* were not chief stewards, but only factotum members who were not accomplishing anything

ruling on Defendants' Summary Judgment Motion, the Court must determine whether the "reckless-or-knowing falsehood" standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is applicable in the context of intra-union labor disputes.

*Determination of the Proper Standard.*— In *Linn v. United Plant Guard Workers of America, Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the United States Supreme Court held that libel actions under state law were pre-empted by the federal labor laws to the extent that the State sought to make actionable defamatory statements in labor disputes which were published without knowledge of their falsity or reckless disregard for the truth. *Id.* at 61, 86 S.Ct. at 662. Considering congressional intent in enacting the National Labor Relations Act ("NLRA"), the Court found that Congress intended to encourage free debate on issues dividing labor and management, and noted that the National Labor Relations Board had allowed wide latitude to the competing parties in considering the extreme and often vituperative statements circulated during labor controversies. *Id.* at 60–62, 86 S.Ct. at 661–63. While the Court held that the NLRA did not completely preempt the application of state laws to libels published during labor disputes, in order to prevent "unwarranted intrusion upon [the] free discussion envisioned by the Act," the Court found it necessary to impose substantive restrictions on the state libel laws to be applied to defamatory statements in labor disputes. *Id.* at 65, 86 S.Ct. at 664. Adopting, by analogy, the standards enunciated in *New York Times v. Sullivan,* the Court limited the availability of state remedies for libel "to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage." *Linn,* 383 U.S. at 64–65, 86 S.Ct. at 664.

In *Linn,* the union's allegedly defamatory statements were made during the course of a representation election campaign. In *Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers, AFL–CIO v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("*Letter Carriers*"), the Supreme Court extended the protection afforded union speech, finding that "any publication made during the course of union organizing efforts, which is arguably relevant to that organizational activity, is entitled to the protection of *Linn.*" While *Linn* involved a dispute between labor and management, in *Letter Carriers,* non-union employees sued the union for libel after their names were included in a "List of Scabs" in the union's monthly newsletter. In considering the factual distinctions between the cases, the Court rejected a narrow reading of the NLRA and the Executive Order under which *Letter Carriers* arose,[11] and emphasized that "application of *Linn* must turn on whether the defamatory publication is made in a context where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated." *Letter Carriers,* 418 U.S. at 279, 94 S.Ct. at 2778. Thus, the Court held that, because use of the epithet "scab" was not a false statement of fact, the "reckless-or-knowing falsehood" test adopted in *Linn* had not been satisfied, and Defendants' speech was protected under federal law.

The parties in the case at bar devote considerable ink to arguing either for or against the applicability of the *New York Times* standard to the facts of this case. Citing *Linn* and *Letter Carriers,* Plaintiffs argue that the qualified privilege afforded union speech does not apply to Defendants' newsletters, because the alleged "libel is by union [sic] (acting through its agent acting as receiver) of its own members, not in trying to organize [as in *Letter Carriers* ] . . . or in communications against management" [as in *Linn* ].

for the Union members since they worked for management."
(h) *"David Gollinger,* as previously stated, was used as a ploy in an attempt to discredit this union."

**11.** Because *Letter Carriers* involved federal employees, the relevant federal law was Executive Order No. 11491 rather than the NLRA. However, the Court found that, like section 7 of the NLRA, section 1 of the Executive Order guarantees "[t]he right to attempt to persuade others to join the union," which is derived from the right enshrined in both sections to form, join and assist labor organizations. *Letter Carriers,* 418 U.S. at 278, 94 S.Ct. at 2778.

Plaintiffs' Motion for Interlocutory Summary Judgment, at 11. Defendants argue on the basis of the same cases that, because the policies of federal labor law identified in *Letter Carriers*—protecting and encouraging open and robust debate—are impacted in this case, the *New York Times* standard necessarily extends to the internal union arena.

The Court recognizes a distinction between this case and the decisions cited by Defendants, *i.e.*, none of the cases cited by Defendants applied the *New York Times* standard in the context of an intra-union labor dispute.[12] Nevertheless, the Court finds that, because Defendants' allegedly libelous statements were made "in a context where the policies of the federal labor laws ... are significantly implicated," *Letter Carriers*, 418 U.S. at 279, 94 S.Ct. at 2778, *Linn's* "reckless-or-knowing falsehood" test should be applied to the facts of this case.

■■■ Here, the relevant federal law is neither the NLRA nor its concomitant Executive Order (considered by the Supreme Court in *Linn* and *Letter Carriers*), but Title I of the LMRDA. Nevertheless, the Court finds that "the same federal policies favoring uninhibited, robust, and wide-open debate in labor disputes are applicable [in this case]." *Letter Carriers*, 418 U.S. at 273, 94 S.Ct. at 2776. The LMRDA guarantees to members of labor organizations freedom of speech and assembly in a self-styled "Bill of Rights." Plaintiffs cited this provision in the May 1993 "New Direction" newsletter, and seemingly relied upon it throughout the tenure of the receivership in publishing criticisms of the union leadership:

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meeting....

The "Bill of Rights" provision of the LMRDA was intended to create effective democracy within labor unions and to make accountable previously untouchable union leaders. *American Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 182–83, 85 S.Ct. 300, 306–07, 13 L.Ed.2d 214 (1964). As the Supreme Court found in *Steelworkers v. Sadlowski*, 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982),

Congress adopted the freedom of speech and assembly provision in order to promote union democracy. It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal. Congress also recognized that this freedom is particularly critical, and deserves vigorous protection, in the context of election campaigns. For it is in elections that members can wield their power, and directly express their approval or disapproval of the union leadership.

*Id.* at 112, 102 S.Ct. at 2346. Although Defendants were quasi-union officers installed by the International, to the extent that they vied for elective office,[13] Defendants also were union *members* entitled to the protection of the "Bill of Rights."[14] As such, they

12. Defendants characterize *Breen v. DeLord*, 723 S.W.2d 166 (Tex.App—Austin 1986, no writ), as a case involving competing union factions, but *Breen's* application of the *New York Times* standard seemed to turn on the plaintiff's status as a "public figure" rather than on the underlying labor dispute. In addition, the Court of Appeals described *Breen* as "an on-going dispute involving two competing labor organizations," rather than as a case involving internal union factions.

13. Frank McCann's status is less clear given the fact that he was an International Vice President based in New York, where he served as the Local Union's Administrator. Although McCann may not have run for union office, however, his depo-

sition testimony suggests that the four Houston based defendants were pitted against Plaintiffs in at least one Local union election:

Leonard Kirk, Gollinger, and the rest of them ran for local office, even ran for the highest office, Local President. The people that were on our team ran for the highest officers [sic]. They came out last. What does that say? Certainly being affiliated with the administration didn't help the people that were in there in the political process.

McCann deposition, at 146.

14. The Court notes that it was rank-and-file members rather than union officers whom Congress sought to protect in adopting Title I of the

took part in "robust debate" with their political opponents in the Local Union, a debate sparked by publication of the "New Direction" newsletters in early 1993.

The "Enough is Enough" newsletter was published in response to a series of "New Direction" newsletters critical of Defendants' leadership. The "New Direction" newsletters demonstrate that Plaintiffs had at least a quasi-political agenda in attacking union leadership during the tenure of the receivership. For instance, in the May 1993 "New Direction" newsletter, Plaintiffs described one of their organizational "goals" as "[hastening] the demise of receivership and [restoring] the democratic process in Local 260, no later than October 1, 1993." Plaintiffs further declared their "intention to petition the International for a commitment to return [the Local Union] to the Democratic process with elections held no later than October 1, 1993 for the remainder of the Carrington administration." The "New Direction" newsletters were originally published, in part, to inform the union membership "that the [1993] ratification election [approving the receivership's collective bargaining agreement with Metro] was tainted by irregularities." Plaintiffs' Motion for Interlocutory Summary Judgment, at 4. In addition, Plaintiffs were candidates in the Local Union's election for a delegate to the International Constitutional Convention in August 1993. (Defendant Charleston Campbell, one of the co-authors of the "Enough is Enough" newsletter, was also listed on that election ballot.)

It therefore is apparent that the "New Direction" newsletters were attempts to campaign for the delegate's position, or at least to discredit political opponents (like Charleston Campbell) associated with the receivership.[15] Analogously, the "Enough is Enough" newsletter was also linked to the post-receivership elections held in April 1994. Plaintiffs considered publication of the newsletter a conspiracy to keep them from running for office once the union came out of receivership. Affidavit of Plaintiff John Parker, at 23.

■ The political backdrop in this case suggests that the "New Direction" and "Enough is Enough" newsletters were published during a period of internal union strife when Plaintiffs and one or more Defendants were vying for elective office during the receivership and/or the post-receivership regime. This is precisely the context in which "the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated." *Letter Carriers*, 418 U.S. at 279, 94 S.Ct. at 2778. "Robust" debate fosters effective democracy within labor unions, as in any political arena, local or national. As the Supreme Court stated in *New York Times Co. v. Sullivan*, cases involving speech are to be considered "against the background of a profound commitment to the principle that debate should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks ..." *Id.*, 376 U.S. at 270, 84 S.Ct. at 721.

Therefore, the Court concludes that, because the statements at issue in this case were made in anticipation or in the context of a series of union elections, the policy interests expressed by the Supreme Court in *Linn* and *Letter Carriers* apply to Title I of

LMRDA. *See Finnegan v. Leu*, 456 U.S. 431, 436–37, 102 S.Ct. 1867, 1870–71, 72 L.Ed.2d 239 (1982). Thus, while criticism of union *officers* is protected speech under the LMRDA, it is not clear how far officers' criticism of union *members* may go. Nevertheless, the Court finds that, despite their dual status as interim union officers *and* union members, Defendants were protected by the LMRDA when engaged with other members in intra-union, political debate.

**15.** The authors of the "Out the Door" newsletter perceived the "New Direction" newsletters as blatant attempts to win votes in the August 1993 election. In backing Charleston Campbell, *et al.*, for the delegate's position to the International

Convention, Thomas and Roushion urged union members to disregard the "New Direction" newsletters and vote against the "New Direction" candidates:

[t]he many fliers out there don't tell the complete story. Their purpose is to scatter votes and cause confusion. *New Direction I* and *New Direction II* are not the directions this union needs to take.... This election is not about race or control. It is about going to a convention and bringing back information that will govern us the next three years. Please do not waste your vote on a *new direction* slate which offers no direction at all.

LMRDA, and the *New York Times v. Sullivan* standard applies to the allegedly libelous statements published by Defendants in the "Enough is Enough" newsletter.

 *Application of the New York Times Standard.*—Under the *New York Times* standard, Plaintiffs have the burden of demonstrating "malice" by clear and convincing evidence. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Thus, Plaintiffs must prove that, when the "Enough is Enough" newsletter was published, Defendants knew that the allegedly libelous statements were false, or acted with reckless disregard for the truth. However, to survive Defendants' motion for summary judgment, Plaintiffs need only present evidence from which a jury might reasonably return a verdict in Plaintiffs' favor. *Id.* at 257, 106 S.Ct. at 2514–15. If Plaintiffs present such summary judgment evidence, there is a genuine issue of fact that requires a trial. *Id.*

 Defendants contend that the statements in the "Enough is Enough" newsletter were made without malice because they reasonably believed that Plaintiffs were affiliated with the discredited union leadership removed from office for alleged mismanagement and misuse of funds.[16] The identical affidavits of the Defendant authors of the "Enough is Enough" newsletter (Charleston Campbell, Billy Prince and Harry Winters) address in some detail the bases for their belief in the truth of the allegedly libelous statements in the newsletter. Each affiant concludes with the averment, "[a]t the time we published the *Enough is Enough* newsletter," I did not know that any factual statement we made was false, nor did I have any serious doubts as to the truth of any

factual statements made in [the "Enough is Enough" newsletter].[17]

Plaintiffs counter Defendants' summary judgment evidence with their own affidavits in which they assert that there was no relationship between Plaintiffs and the former union administration following the International's imposition of the receivership. Affidavit of Leonard Kirk, at 8; Affidavit of David Carrington, at 2. Plaintiffs also allege that Defendants conducted an investigation which disclosed no evidence linking the Plaintiffs to any misconduct with regard to union funds or properties; that, for at least six months prior to the publication of the "Enough is Enough" newsletter, Defendants were aware that Plaintiffs identified themselves as "New Direction" and had distinguished themselves from "New Direction II," the supporters of the former union president, David Carrington; and that Defendants were aware that Carrington had fired Plaintiff Leonard Kirk prior to imposition of the receivership. Plaintiffs' Response to Defendants' Motion for Summary Judgment, at 18–21.

Plaintiffs also have submitted sufficient summary judgment evidence, in large part through excerpts from Defendants' deposition testimony, that (1) Defendant Billy Prince had been receiving the "New Direction" newsletter since February 1993 (Prince Deposition, at 108–09); (2) Prince automatically assumed that anyone who served in any capacity for the Local Union was "with" or "in office" with the former union president (Prince Deposition, at 64); (3) the "Enough is Enough" newsletter implied that Plaintiffs absconded with the mobile telephones and beepers which the Union had to pay for (Prince Deposition, at 114–15; (4) Prince saw no paperwork indicating that

16. Defendants allege that an accounting review conducted after the previous union leadership was removed revealed that the Local Union had incurred more than $16,000 in telephone expenses through the purchase of cellular telephones, pagers and related operating services. Defendants further allege that this equipment was never located or returned to GTE, the company which leased the mobile phones and pagers to the Local Union. Several of Defendants' affidavits aver that, when the "Enough is Enough" newsletter was prepared, Defendants understood

that, as officials of the former union administration, Plaintiffs had received pagers and cellular telephones. Supplemental Affidavit of Charleston Campbell, at 11–12; Supplemental Affidavit of Billy Prince, at 11–12; Supplemental Affidavit of Harry Winters, at 11–12.

17. Supplemental Affidavit of Charleston Campbell, at 18; Supplemental Affidavit of Billy Prince, at 18; Supplemental Affidavit of Harry Waters, at 18.

any of the Plaintiffs had a cellular telephone or beeper which he had not paid for personally (Prince Deposition, at 115–16); (5) in Defendants' perception, "desperadoes" connotes "gangsters," "crooks" and "cut-throats" (Prince Deposition, at 118); and (6) the Administrator, Defendant Frank McCann, had no information to support the statements or implications in the "Enough is Enough" newsletter that Plaintiffs misused cellular telephones and beepers and used union expense monies for non-union business and personal pleasure (McCann Deposition, at 146–147).

The Court finds that the evidence in the record, if proved by Plaintiffs and believed by a jury, could support a finding of actual malice under the clear and convincing standard. *Anderson v. Liberty Lobby*, 477 U.S. at 255–56, 106 S.Ct. at 2513–14. Thus, there is a genuine issue of material fact that requires a trial, *id.* at 257, 106 S.Ct. at 2514–15, and **Defendants' Motion for Summary Judgment is DENIED as to Plaintiffs' claims for defamation of character, slander and libel.**

### 6. *Plaintiffs' Retaliation Claim*

■ Plaintiffs allege that, by publishing the "Enough is Enough" newsletter, Defendants retaliated against them "for the exercise of [Plaintiffs'] rights of free expression [guaranteed by the LMRDA, 29 U.S.C. §§ 411(a)(2) and 529]"; for "documenting, assembling and publishing contract items kept hidden from the membership"; and for "documenting, circulating and submitting to the Int. Pres. George Leitz, approximately 400 membership signatures desiring an explanation, and investigation into the use of a nonexistent return Post Office Box for the mail-in ballots to be returned for contract ratification." Plaintiffs' Second Amended Complaint, ¶¶ 22, 23 and 31. The affidavit of Leonard Kirk asserts that Defendants' "retaliation is [the "Enough is Enough"] newsletter, and that Plaintiffs were retaliated against or disciplined (Kirk uses the terms interchangeably) for publishing the "New Direction" newsletters." Kirk Deposition, at 62–64.

To the extent that "retaliation" and "discipline" are synonymous, the Court has addressed Plaintiffs' claim that Defendants disciplined them in violation of the LMRDA for publishing the "New Direction" newsletters. *See supra* Section III(4). Because there is no evidence in the record to suggest that Defendants fined, suspended, expelled or otherwise disciplined Plaintiffs, **Summary Judgment is GRANTED in favor of Defendants as to Plaintiffs' claims for retaliation under the LMRDA.**

### 7. *Breach of the Duty of Fair Representation*

Plaintiffs allege that Defendants had a statutory and common law duty to provide fair representation to all members, and that this duty was breached by Defendants'

(a) singling out Plaintiffs for approbation and censure in retaliation for the exercise of their rights of free speech and expression;

(b) falsely labeling Plaintiffs as criminals and fugitives from justice knowing the facts to be otherwise or in reckless disregard of the truth;

(c) attributing to Plaintiffs alleged criminal acts and omissions of a deposed Local 260 administration after Defendants were notified that Plaintiffs were not the individuals who allegedly perpetrated the said acts or who approved or ratified such acts;

(d) rigging Local 260 and International elections by publishing said libels;

(e) posting illegal bulletin board notice publishing said libels to labor and management;

(f) utilizing the controversy with Plaintiffs as an excuse to prolong the International takeover of Local 260.

Plaintiffs' Second Amended Complaint, at 10–11.

■ A labor organization has a statutory duty of fair representation under the National Labor Relations Act, as amended, 29 U.S.C. §§ 151 *et seq.*, "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty,

and to avoid arbitrary conduct." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6,* 493 U.S. at 73, 110 S.Ct. at 429. Section 8(b)(1)(A) of the Act "prohibits labor organizations, when acting in a statutory representative capacity, from taking action against any employee upon considerations or classifications which are irrelevant, invidious or unfair." *Id., citing N.L.R.B. v. Miranda Fuel Co., Inc.,* 140 N.L.R.B. 181, 185 (1962), *enf. denied,* 326 F.2d 172 (2d Cir.1963). In *Bass v. Int'l Brotherhood of Boilermakers,* 630 F.2d 1058 (5th Cir.1980), the Fifth Circuit considered the parameters of the duty of fair representation ("DFR"):

> the existence of the DFR, however, does not permit federal court scrutiny of all of a union's internal affairs. Because the DFR is imposed on the union as a result of its position as exclusive bargaining representative, it applies only to union conduct arising from the union's position as representative. Thus, in *Smith v. Local No. 25, Sheet Metal Workers,* 500 F.2d 741, 746 (5th Cir.1974), we stated that the union owes "the duty to represent fairly the interest of each employee in the unit *in dealings with the employer.*" (Emphasis supplied.) Therefore, union conduct that affects only an individual's relationship within the union structure is not circumscribed by the constraints of the DFR. Subject to the provisions of its constitution and bylaws and the constraints imposed by statute, the union is necessarily invested with broad discretion to make internal union decisions in a manner the leadership considers beneficial both to the union membership at-large and to any individuals involved.

*Id.* at 1062–63.

Defendants argue on the basis of *Bass* that the duty of fair representation does not arise in internal union situations and must be distinguished from matters falling into the employer/employee arena. Plaintiffs point out in response that cases subsequent to *Bass*

have held that the duty of fair representation applies to an internal union matter where it has some substantial impact on the employee's relationship with the employer.

▆▆▆ Although the Court agrees with Plaintiffs' characterization of cases subsequent to *Bass,* the case cited by Plaintiffs in illustration, *Kolinske v. Lubbers,* 712 F.2d 471 (D.C.Cir.1983), does not represent a departure from *Bass,* as Plaintiffs imply, but rather an exception to a more general rule. *Kolinske* actually cites *Bass* for the proposition that "the duty of fair representation extends only to matters involving an employee's dealings with his employer and ordinarily does not affect an employee's relationship with the union structure," *Kolinske v. Lubbers,* 712 F.2d at 481, *citing Bass v. Int'l Brotherhood of Boilermakers,* 630 F.2d 1058 (5th Cir.1980). Only after this reference to *Bass* did the *Kolinske* Court of Appeals note (in the passage relied upon by Plaintiffs) that "the NLRB and courts have usually excluded internal union affairs from being within 'a matter ... affecting employment,' unless the internal union matter has some 'substantial impact' on an employee's relationship with his employer." *Kolinske v. Lubbers,* 712 F.2d at 481. "The touchstone for determining whether a union's action violated the duty of fair representation is whether that action adversely impacted on 'matters affecting employment.'" *Local 222, United Food and Commercial Workers Int'l Union,* 1979 WL 10034, at *7 (N.L.R.B. Sept. 28, 1979), *citing N.L.R.B. v. Miranda Fuel Co., Inc.,* 140 N.L.R.B. 181, 185 (1962).

▆▆▆ Plaintiffs argue that, had they been successful in the election of union officers in 1994, they would have taken leaves of absence from their jobs in order to work as union officers, and that this is "substantial impact" upon their employment relationship with Metro to support a finding of a breach of the duty of fair representation. Reply to Defendants' Supplemental Motion for Summary Judgment, at 3.[18]

---

18. Plaintiffs have cited no cases involving internal union policies or practices in which a breach of the duty of fair representation was found. The Court has unearthed only one case which suggests that internal union policies may give rise to the duty of fair representation, *Retana v. Apart-* *ment, Motel, Hotel and Elevator Operators Union, Local No. 14, AFL–CIO,* 453 F.2d 1018 (9th Cir. 1972). Reversing the district court's dismissal of a duty of fair representation claim, the Court of Appeals found that

The Court rejects Plaintiffs' argument. Plaintiffs do not allege that Defendants took any affirmative action which directly and immediately damaged their employment relationship with Metro. Plaintiffs were neither disciplined, fined nor suspended by management because of the publication or distribution of the "Enough is Enough" newsletter, which had absolutely nothing to do with a collective bargaining agreement or with Defendants' position as exclusive bargaining representative for the Local Union. Moreover, it is far too speculative to suggest that, but for publication of the "Enough is Enough" newsletter, Plaintiffs would have been elected to executive positions within the Local Union.

Even if such a link could be demonstrated, there is still no evidence to suggest that, by publishing the "Enough is Enough" newsletter, Defendants *adversely* impacted Plaintiffs' employment relationship with Metro. To say that Metro would have given Plaintiffs leaves of absence had they been elected to union office is not to say that publication of the "Enough is Enough" newsletter "adversely impacted on 'matters affecting employment.'" *Local 222, United Food and Commercial Workers Int'l Union*, 1979 WL 10034, at *7. Finally, Plaintiffs do not allege that, by publishing the "Enough is Enough" newsletter, Defendants impacted their rights "in relation to the negotiation and administration of [a] collective bargaining agreement," *Retana v. Apartment, Motel, Hotel and Elevator Operators Union, Local No. 14, AFL-CIO*, 453 F.2d at 1024.

Because Plaintiffs have shown no adverse impact on their relationship with Metro, the Court finds that Plaintiffs have failed to state a claim for breach of the duty of fair representation. **Defendants' Motion for Summary Judgement is therefore GRANTED with respect to Plaintiffs' claim for breach of the duty of fair representation,** and this cause of action is hereby DISMISSED.

### 8. *Breach of Contract and Breach of Collective Bargaining Agreement*

 Plaintiffs allege that, by posting copies of the "Enough is Enough" newsletter on employee and union bulletin boards, Defendants breached the collective bargaining agreement, which provides that union notices posted on Metro bulletin boards shall not be "derogatory to any individual." [19] Because Plaintiffs have sued only their union and not their employer, the Court finds that Plaintiffs fail to state a claim for breach of contract and breach of a collective bargaining agreement.

 Plaintiffs cite Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), as one of two jurisdictional bases for their federal action against the Local Union and the International. Plaintiffs improperly invoke the Court's jurisdiction under this provision. On its face, this

---

it is not difficult to conceive a set of facts that might be proven under the allegations of this complaint, in which a minority group of union members were effectively deprived of an opportunity to participate either in the negotiation of a collective bargaining contract or in the enjoyment of its benefits by a language barrier which union official exploited, or took no steps to overcome. Such acts or omissions of union officials might well violate the union's duty "to make an honest effort to serve the interests" of all members of the bargaining unit (citations omitted). *Id.* at 1024. In *Retana*, unlike the case at bar, most of the allegations in the complaint concerned matters related to the negotiation or administration of the union's collective bargaining agreement, such as the union's failure to provide minority members who spoke little English with a copy of the collective bargaining agreement in Spanish. This suggests that internal union policies which "substantially impact" the employer/employee relationship are those that "impact upon members' rights in relation to the negotiation and administration of the collective bargaining agreement." *Id.* at 1024–25. The *Retana* circumstances are not presented here.

19. Pursuant to Section 106 of the Labor Agreement between Metro and the Local Union,
(A) The Union shall have the right to post notices of meetings (regular, special, or social) and bulletins of general civic or patriotic interest to the employees on Union bulletin boards provided by the Authority in places provided by the Authority in places agreed upon by the parties.
(B) Such notices shall not be derogatory to any individual or injurious to the Authority's interest and shall be signed by the President or the President's designated Representative of the Union (Local 260) and carry the Union seal.

statute "allows actions between *labor organizations* and *employers* to be brought in federal court for an alleged violation of a collective bargaining agreement." *Smith v. Kerrville Bus Co., Inc.,* 748 F.2d 1049 (5th Cir.1984) (emphasis added). Section 301 permits an employee to bring an action against his *employer* for breach of a collective bargaining agreement and against his *union* for violating its duty of fair representation by mishandling an ensuing grievance. *Carmena v. Brown–Eagle Corp.,* 722 F.Supp. 264, 265 (M.D.La.1989). The two causes of action are commonly known as a hybrid Section 301/duty of fair representation suit. *Id.*

The case at bar, however, is not a hybrid breach of contract/DFR claim. Plaintiffs have not alleged the threshold element that Metro breached its employment contract with the Local Union.[20]

 Moreover, Plaintiffs cite no case law for the proposition that the collective bargaining agreement creates an implied right of action in favor of members seeking recovery against labor organizations.[21] Therefore, **Summary Judgment is GRANTED to Defendants as to Plaintiffs' claims** for breach of contract and breach of a collective bargaining agreement. Because Plaintiffs have failed to state a claim under Section 301 of the LMRA, these claims are hereby DISMISSED.

### 9. Tortious Interference with Contract

 Plaintiffs allege that in publishing the "Enough is Enough" newsletter, Defendants were aware of the prohibition in the collective bargaining agreement against the posting of "derogatory" notices "and yet intentionally and willfully acted to interfere with the employment relationship between the Plaintiffs and their employer, Metro." Plaintiffs' Second Amended Complaint, at 8. Plaintiffs fail to state a claim for tortious interference with contract because they have not alleged that Defendants induced Metro not to perform under the collective bargaining agreement or that Metro, in fact, breached the contract.

 Under Texas law, the elements of a cause of action for tortious interference with contractual relations are (1) the existence of a contract subject to interference, (2) the act of interference was willful and inten-

---

**20.** Moreover, if Plaintiffs sought to amend their complaint, it would be futile on the factual record presented. There is no suggestion in the pleadings that Metro breached the collective bargaining agreement by allowing Defendants to post the "Enough is Enough" newsletter on employee bulletin boards. In fact, it appears that Metro knew nothing about the newsletter until one of the Plaintiffs wrote to Gerald Hayden, Assistant General Manager for Labor Relations, objecting to Defendants' characterization of Plaintiffs as "desperadoes" and advising him that, in accordance with the collective bargaining agreement, Metro management "has the right to enforce this type of conduct."

**21.** Even if they attempted to do so, it appears that Plaintiffs did not follow the grievance procedure under Section 202 for resolving disputes under the contract. Plaintiff John Parker wrote a letter to Metro complaining about the "Enough is Enough" newsletter, but he did not consider the letter to be a "grievance." Parker Deposition, at 81. "As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union." *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 651, 85 S.Ct. 614, 615–16, 13 L.Ed.2d 580 (1965). Although in *Republic Steel Corp.,* an employee sued his employer rather than a labor organization, the federal labor policy identified by the Court—resolution of labor disputes without interference by the courts—also applies in the intra-union context. For example, Title I of the LMRDA, which contains the union members' "Bill of Rights," requires that union members exhaust reasonable hearing procedures before instituting legal or administrative proceedings against a labor organization. 29 U.S.C. § 411(a)(4). Similarly, Title IV of the LMRDA, which relates to election improprieties, permits a union member to file a complaint with the Secretary of Labor only after he or she has exhausted internal union remedies or invoked available remedies without obtaining a final resolution within three months after their resolution. 29 U.S.C. § 482. Although, when asserting their rights against a trusteeship under Title III of the LMRDA, union members are not required to exhaust internal remedies, *McDonald v. Oliver,* 525 F.2d 1217, 1229 (5th Cir.1976), by their own admission, Plaintiffs' action arises under Title I of the LMRDA, not Title III. Therefore, Title I's exhaustion requirement should apply by analogy to an action by union members against a labor organization for the alleged breach of a collective bargaining agreement.

Page 794 header.

tional, (3) such intentional act was a proximate cause of plaintiff's damage, and (4) actual damage or loss occurred. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991); *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.,* 793 S.W.2d 660, 664 (Tex.1990). A necessary element of the plaintiff's cause of action is a showing that the defendant took an active part in persuading a party to a contract to breach it. *Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768, 803 (Tex.App.—Houston [1st Dist.] 1987), *cert. dismissed,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). It is necessary that there be some act of interference or of persuading a party to breach, for example by offering better terms or other incentives, for tort liability to arise. *Id.*

Plaintiffs do not allege that Metro violated the terms of the collective bargaining agreement or that Defendants induced Metro not to perform under the contract.[22] In addition, because the Local Union is a party to this agreement in its capacity as collective bargaining representative, it makes little sense to suggest that Defendants induced Metro to breach a contract to which Defendants, in their representative capacities as officials of the Local Union, are parties.

Therefore the Court finds that Plaintiffs have failed to state a claim for tortious interference with contract. **Defendants' Motion for Summary Judgment is GRANTED as to this cause of action.** Plaintiffs' tortious interference claim is hereby DISMISSED.

### 10. *Unfair Labor Practice*

■■■ Plaintiffs allege an unfair labor practice in their laundry list of claims, but nowhere in the complaint do they articulate what unfair labor practice Defendants allegedly committed. Unfair labor practices are governed by the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* The Act defines certain unfair labor practices and mandates a procedure through the National Labor Relations Board ("NLRB") to process and remedy unfair labor practices. As a general rule, federal courts do not have juris-

diction over unfair labor practices; they must defer to the exclusive competence of the NLRB. *U.A. 198 Health & Welfare, Education & Pension Funds v. Rester Refrigeration Service, Inc.,* 790 F.2d 423, 425 (5th Cir.1986), *cert. denied,* 485 U.S. 904, 108 S.Ct. 1074, 99 L.Ed.2d 233 (1988), *citing Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 83, 102 S.Ct. 851, 859, 70 L.Ed.2d 833 (1982).

Because the Court does not have jurisdiction to determine what is or is not an unfair labor practice, *Kaiser Steel Corp., v. Mullins,* 455 U.S. at 83, 102 S.Ct. at 859, **Summary Judgment is GRANTED for Defendants as to this cause of action,** and Plaintiffs' claim is hereby DISMISSED.

### 11. *Civil Conspiracy*

Plaintiffs allege a conspiracy among the individual defendants to commit libel and libel per se, and among the Local Union, the International, Frank McCann and John Bland "to tortuously [sic] interfere with a contract, to fraudulently mislead union membership regarding Plaintiffs' fitness to serve as union officers in order to promote the candidacy of Defendants' hand-picked sympathizers." Plaintiffs' Second Amended Complaint, at 9. Plaintiffs further allege a conspiracy between Defendants (without distinguishing between the individual Defendants and the Local or International Union) to breach the collective bargaining agreement, the Union Constitution and the Local Union bylaws. *Id.* at 5.

■■■ Under Texas law, an actionable conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Corp.,* 652 S.W.2d 932, 934 (Tex.1983). As applicable here, the essential elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Id.* Unlike criminal conspiracy, civil conspiracy itself does not

---

**22.** Again, it would be futile to allow Plaintiffs to amend their complaint because as discussed above, *see supra* Section III(8), there is no suggestion in this voluminous record that Metro violated the collective bargaining agreement.

create liability—the conspirators must pursue an independently unlawful purpose or use an independently unlawful means before they can be held liable. *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149, 1169 (5th Cir.1982).

■ Civil conspiracy is an intentional tort, *Closs v. Goose Creek Consol. Indep. Sch. Dist.,* 874 S.W.2d 859, 872 (Tex.App.—Texarkana, 1994, no writ), the object of which is the unlawful predicate act of the conspiracy. *Metzger v. Sebek,* 892 S.W.2d 20, 43 (Tex. App.—Houston [1st Dist.] 1994). As the Texas Supreme Court has noted, civil conspiracy might be called a derivative tort. *Tilton v. Marshall,* No. 94–1233, 1995 WL 453268, at \*8 (Tex. Aug. 1, 1995), *petition for reh'g filed Aug. 21, 1995, citing Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 925 (Tex.1979). That is, a defendant's liability for conspiracy depends on participation in some underlying tort or, arguably other unlawful conduct, for which the plaintiff seeks to hold at least some of the named defendants liable. *Id.*

■ Because the Court has dismissed Plaintiffs' claims for tortious interference with contract and violations of the Union's collective bargaining agreement and bylaws (the unlawful predicate acts), Plaintiffs' claims for conspiracy to commit these wrongs are without legal foundation. *See Schoellkopf v. Pledger,* 778 S.W.2d 897, 900 (Tex. App.—Dallas, 1989, writ denied) (absent evidence to support a substantive tort, there is no liability for civil conspiracy).

Therefore, **Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' claims for civil conspiracy to commit tortious interference with contact and to violate the Union collective bargaining agreement and bylaws,** and these claims are hereby DISMISSED.

Plaintiffs, however, have alleged the requisite elements for conspiracy to commit libel or libel per se and, potentially, to violate the Union Constitution. *See, e.g.,* Plaintiffs' Second Amended Complaint, ¶¶ 12, 19 and 21.

Therefore, **Defendants' Motion for Summary Judgment is DENIED at this time as to Plaintiffs' claims for civil conspiracy to commit libel or libel per se and to violate the Union Constitution.**

## IV. *Plaintiffs' Motion for Interlocutory Summary Judgment*

In their motion for Interlocutory Summary Judgment, Plaintiffs ask the Court to hold that the statements made by Defendants in the "Enough is Enough" newsletter are libelous per se. Plaintiffs' motion must be DENIED.[23]

■ If the pleadings and evidence raise the issue of whether the newsletter Defendants published contains statements that are libelous per se, the issue of truth or falsity must be submitted to the jury. *Houston Belt & Terminal Ry. v. W. Wherry,* 548 S.W.2d 743, 750 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.), *quoting Fitzjarrald v. Panhandle Publishing Co.,* 228 S.W.2d 499, 506 (Tex.1950).

Because the Court has found that the *New York Times* standard is applicable to the statements contained in the "Enough is Enough" newsletter, these offending statements must be submitted to a jury for a determination of, first, whether the statements were true or false; second (if the statements are found to be false), whether they were "published" within the meaning of the libel laws; third, whether Defendants published the offending statements with malice, *i.e.,* knowledge that they were false or with reckless disregard for the truth; and, fourth (if the statements are found to be libelous), what damages should be awarded to Plaintiffs. *See Houston Belt & Terminal Ry. v. W. Wherry,* 548 S.W.2d at 750 (defendants must be shown to have "published" the allegedly libelous statement, i.e., communicated it to some third person capable of understanding its defamatory import); *Whalen v. Weaver,* 464 S.W.2d 176, 182 (Tex.Civ. App.—Houston [1st Dist.] 1970, writ ref'd n.r.e.) (the amount of damages recoverable

---

**23.** Plaintiffs seem to argue that, because damages need not be proved when language is actionable per se, the Court may hold on a summary judgment motion that the statements in the "Enough is Enough" newsletter were libelous per se.

for slander per se is peculiarly within the province of the jury).

■ Under Texas law, statements are libelous per se if they impute the commission of a crime which carries a penalty of incarceration, *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 630 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), or affect a person injuriously in his or her office, profession or occupation. *Panhandle Publishing Co. v. Fitzjarrald*, 215 S.W.2d 659, 660–61 (Tex.Civ. App.—Amarillo 1948, orig. proceeding [leave denied] ).

■ In their Motion for Summary Judgment, Plaintiffs suggest that the statements in the "Enough is Enough" newsletter were libelous per se because (1) Plaintiffs were characterized as "desperadoes" (a term which Defendant Billy Prince equates with "crook," Prince Deposition, at 118) and (2) the newsletter affected Plaintiffs injuriously in their offices, professions or occupations (presumably by aligning them with the prior, discredited union administration and skewing election results in the 1994 Local Union's election). "Libelous per se" means that written or printed words are so obviously hurtful to the person aggrieved by them that they require no proof of their injurious character to make them actionable. *Rawlins v. McKee*, 327 S.W.2d 633, 635 (Tex.Civ.App.— Texarkana 1959, writ ref'd n.r.e.). Where the language is actionable per se, *damages* are conclusively presumed and need not be proved. *Bayoud v. Sigler*, 555 S.W.2d 913, 915 (Tex.Civ.App.1977, writ dism'd) (emphasis added).

■ To request summary judgment from the Court is to disregard the many fact questions raised by the language of the "Enough is Enough" newsletter. For example, it is not clear that, by characterizing Plaintiffs as "desperadoes," Defendants have imputed to Plaintiffs the commission of a crime which carries the penalty of incarceration. Moreover, in their response to Plaintiffs' Motion for Summary Judgment, Defendants point out that at no time did they accuse Plaintiffs of being criminals or of misusing union funds. Because the import of "desperado" is unclear, and some of the

statements in the "Enough is Enough" newsletter were phrased as rhetorical questions (*e.g.,* "where are the expense monies which were used for non-union business and personal pleasures?"), the Court finds such language capable of defamatory meaning. However, that is not to say that the these statements are, in fact, libelous per se. Whether statements are capable of the defamatory meaning the plaintiff attributes to them is *initially* a question of law for the court. *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 920 (Tex.App.— Corpus Christi 1991, writ dism'd w.o.j.). (emphasis added). Nevertheless, the determination of the meaning of language that is ambiguous or of doubtful import is the province of the jury. *Houston Belt & Terminal Ry. Co.*, 548 S.W.2d at 748. The test is: What effect would the publication have upon the mind of the ordinary reader? *Id.*

Because a jury must answer this question rather than the Court, **Plaintiffs' Motion for Interlocutory Summary Judgment is DENIED.**

It is therefore ORDERED that **Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.**

It is further ORDERED that **Plaintiffs' Motion for Interlocutory Summary Judgment is DENIED.**