72597. CLINE v. McLEOD et al.
72598, 72599. AT&T TECHNOLOGIES, INC. v. CLINE
(two cases).
72600. HARPER v. McLEOD et al.
72601, 72602. AT&T TECHNOLOGIES, INC. v. HARPER
(two cases).
(349 SE2d 232)

DEEN, Presiding Judge.

Mary K. Cline and her sister Lana K. Harper are appellants in case nos. 72597 and 72600, respectively, and appellees in case nos. 72598 and 72599 and 72601 and 72602, respectively. Since 1968 Cline has been employed by AT&T Technologies, Inc. (AT&T), an appellee in case nos. 72597 and 72600, and appellant in case nos. 72598, 72599, 72601, and 72602. Harper was employed by AT&T from 1974 until some time in 1985. She is a former member of Communications Workers of America, Local 3295, AFL-CIO (the local), also an appellee in case nos. 72597 and 72600, of which Kenneth McLeod (also spelled McCloud), the third appellee in case nos. 72597 and 72600, was president.

On or about August 8, 1983, the local engaged in a strike against AT&T. Harper joined in the strike and walked the picket line for several days. Deciding that this was economically infeasible, however, she resigned from the union and crossed the picket line and went back to work. Cline, who was not a union member, did not participate in the strike. The strike was settled August 29, 1983, and on that day McLeod, in his official capacity, drafted and disseminated to union members a letter congratulating them on the terms of the strike settlement agreement and thanking them for their loyalty and cooperation. The letter also contained the following remarks: "I regret to inform you that our Local had some 18 members or could-be members —

SCABS — who crossed our picket line. I would like to identify each and everyone [sic] of them to you so that you might not be led at some later date into believing that one of these individuals is your friend. Any person who crosses a legitimate picket line, as ours was, is not a friend and a person of this calibre must be closely watched because it is my opinion that this type of individual will steal and cheat if given the opportunity . . . On the following page is a complete list of these SCABS . . . On the last page of this letter is an anatomy of a SCAB." Attached to the letter was a list of the eighteen persons, including Cline and Harper, who had crossed the picket line. Also attached was a drawing captioned "Anatomy of a Scab," which depicted a singularly unattractive person clad in undergarments, with various parts of his body bearing such labels as "Regenerate [Degenerate?] Brain," "Big Nose for Minding Other People's Business," and "Feet Flat from Stepping on Others." A copy of the letter, together with the list and the drawing, was posted on a company bulletin board, which McLeod had AT&T's permission to use on a continuing basis for posting items of interest to employees.

Beginning on or about August 28, 1983, and continuing over a period of at least seven and perhaps as long as eleven months, according to Cline's and Harper's allegations, a series of harassing incidents took place, with one or both of the sisters as the targets. The incidents included being greeted by other employees with "scab" or other uncomplimentary epithets; being pushed out of the way, or blocked, in an aisle in the workplace; being blocked from leaving the elevator; having their cars dented or otherwise damaged more than once while parked in the company lot; receiving harassing telephone calls at home; having glue poured on tools; and having a package containing animal feces deposited at the work station.

Cline and Harper protested these incidents to AT&T management. According to the record, supervisory personnel made a number of attempts, through various means, to prevent the recurrence of such incidents, but with only minimal success. Cline and Harper thereupon, in August 1984, filed separate actions in the Fulton County Superior Court, naming McLeod, the local, and AT&T as defendants in both actions. The first count of each suit alleged defamation; the second, tortious interference with an employment contract; the third, invasion of privacy; and the fourth, intentional infliction of harm and alienation from fellow employees. All four of these counts were alleged against McLeod and the union; a fifth count, failure to provide a safe work place, was brought against AT&T alone. At no time was a claim submitted to the National Labor Relations Board (NLRB) or an action filed in federal court. All defendants in both superior court suits moved for summary judgment. The trial court awarded summary judgment on all four counts to McLeod and the local, on the

ground that the matter was pre-empted by the National Labor Relations Act (Wagner Act), as amended, 29 USC §§ 157, 158 (hereinafter referred to as NLRA or "the Act"). AT&T's motion relative to Count V was denied.

Cline and Harper now appeal the award of summary judgment to McLeod and the local on Counts I, II, and IV only, enumerating as error the court's granting summary judgment on the basis of federal pre-emption (case nos. 72597 and 72600). They have filed identical enumerations of error and arguments and citations of authority. AT&T, having been granted an interlocutory appeal, excepts to the denial of summary judgment in case nos. 72598, 72599, 72601, and 72602. AT&T alleges that Cline's and Harper's claims are pre-empted by the NLRA and the Georgia Workers' Compensation Act; that as a matter of law AT&T discharged its legal duty towards appellants through its good-faith efforts to bring the harassment to an end; and that the court erred in denying the motion for summary judgment with respect to appellants' claims for punitive damages. *Held:*

1. Careful scrutiny of the complicated record of these six companion cases, together with examination of the voluminous case law, persuades us that we must affirm the judgment of the trial court regarding Cline's and Harper's enumeration of error as to Count I. The preparation and dissemination of the "scab letter" and the appurtenant drawing and list[1] is clearly an activity protected by the National Labor Relations Act, 29 USC § 157, and therefore pre-empted by federal law. Not only does this sort of activity enjoy the protection of § 157 and fall outside the prohibition of 29 USC § 158 ("unfair labor practices"); the case law expressly protects the word "scab" and writings analogous to the letter, together with the drawing ("Anatomy of a Scab") and the list. *Old Dominion Branch No. 496, AFL-CIO v. Austin*, 418 U. S. 264 (94 SC 2770, 41 LE2d 745) (1974); *Linn v. United Plant Guard Workers*, 383 U. S. 53 (86 SC 657, 15 LE2d 582) (1966); see also *Southwestern Bell Tel. Co.*, 276 NLRB No. 110 (Sept. 30, 1985).

The "anatomy" is a literary tradition going back at least as far as the Middle Ages. Often but not invariably employed as a satiric weapon, it consists of a metaphorical analysis[2] of a person, an institution, or an idea. The text sometimes, as here, may be accompanied by one or more drawings. By its nature the "anatomy" is not capable of a literal interpretation but proceeds to make its point by way of analogy — usually, the more fanciful, the better. In *Old Dominion v. Austin*, supra, three non-members brought a libel action against the

---

[1] Hereinafter collectively referred to as "the scab letter." See Appendix A.

[2] Or "dissection"; hence, "anatomy." Perhaps the best-known example is Robert Burton's *Anatomy of Melancholy* (1621).

union because the local had published in its newsletter a list of non-members, to which was appended a definition of "scab" attributed to the noted American writer Jack London and employing opprobrious language, including the word "traitor." The United States Supreme Court held that the epithet "scab" was expressly protected and, moreover, that the definition of "scab" used in the article could not be considered a false statement of facts because the definition contained no statements purporting to be factual. The definition was couched in terms obviously fanciful in nature; moreover, it was prefaced by the explanation that, since "[s]ome co-workers are in a quandary as to what a scab is . . . we submit the following." *Austin*, supra at 267. As in the instant case, the language employed in *Austin*, supra, was metaphorical and clearly represented opinion rather than fact.

The court had held in *Cafeteria Employees Union v. Angelos*, 320 U. S. 293, 295 (64 SC 126, 88 LE 58) (1943), that "to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies — like 'unfair' or 'fascist' — is not to falsify facts." The *Austin* court quoted this holding, at 284, and went on to cite *Greenbelt Coop. Pub. Assn. v. Bresler*, 398 U. S. 6, 14 (90 SC 1537, 26 LE2d 6) (1970). In that case Bresler, a property-owner and developer, was negotiating with the city council to obtain zoning variances on land he owned; at the same time, the city was attempting to acquire as a school site another piece of land owned by Bresler. At a public meeting of the city council, at least one person present vocally characterized Bresler's negotiating position as "blackmail"; the local newspaper included this incident in its account of the meeting. Bresler instituted in the state courts a successful libel action, which was ultimately appealed to the United States Supreme Court. In reversing, the Court held, at 14: "No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the [language] was no more than rhetorical hyperbole, a vigorous epithet . . ."

In the instant case, no intelligent reader could have seriously thought that the attributes of the crudely drawn "scab" cartoon were intended to be applied literally to the persons on the list, or that the writer of the letter was accusing them of fraud, theft, or perjury. Moreover, the offending statements were prefaced by the phrase, "in my opinion"; thus the very terms in which the vilifying language was introduced would have dispelled any inference that the "accusations" were being offered as statements of fact.

Furthermore, as the *Austin* court pointed out at 283, one of the generally accepted definitions of "scab," as recorded in Webster's

Third New Intl. Dictionary (unabridged, 1961), is "one who refuses to join a union." To the limited extent that the scab letter might conceivably be considered as factual, then, it was true, not false. Noting that under *Linn v. United Plant Guard Workers, supra,* the knowing falsity/reckless disregard standard of *New York Times v. Sullivan,* 376 U. S. 254 (84 SC 710, 11 LE2d 686) (1964), is the criterion applicable in this fact situation, *Austin* held, at 284, that "[b]efore the test of reckless or knowing falsity can be met, there must be a false statement of fact." This is precisely on point with the instant case.

Even if the challenged language (including the drawing) were not expressly protected by the NLRA, then, it would constitute no cause of action under state tort law. Whether under a federal or a state rubric, this claim was properly rejected by the superior court, and this enumeration is without merit.

2. In exempting from state court jurisdiction certain activities as pre-empted by federal legislation, the nation's highest court has been careful to recognize that, even in the context of such federally pre-empted areas as labor disputes, there are certain issues which are peripheral rather than central to the pre-empted matter, or which are "so deeply rooted in local feeling and responsibility," as to fall outside the federal pre-emption, and therefore within the jurisdiction of the state courts. See, e.g., *Linn v. United Plant Guard Workers,* supra; *San Diego Bldg. &c. Council v. Garmon,* 359 U. S. 236 (79 SC 773, 3 LE2d 775) (1959); *Intl. Assn. of Machinists v. Gonzalez,* 356 U. S. 617 (78 SC 923, 2 LE2d 1018) (1958); *Intl. Union UAA & AIW v. Russell,* 356 U. S. 634 (78 SC 932, 2 LE2d 1030) (1958).

Appellants urge that such is the case with the count of alienation from fellow employees (Count IV), and that the court below therefore erred in holding this claim pre-empted along with that of defamation. In *Sears, Roebuck & Co. v. San Diego County District Council,* 436 U. S. 180 (98 SC 1745, 56 LE2d 209) (1978), a carpenters' union had established picket lines upon the Sears-owned parking lot and the Sears-owned sidewalk separating the store from the parking lot. Sears obtained an injunction prohibiting picketing on the privately owned property, and the picket lines were removed to the public sidewalk which surrounded the property on three sides; Sears made no objection to the new picket lines. The California Court of Appeal affirmed the trial court's granting of the injunction on the basis that the union's continuing trespass on Sears' parking lot and walkway "fell within the longstanding exception [to federal pre-emption] for conduct which touched interests so deeply rooted in local feeling and responsibility that pre-emption could not be inferred in the absence of clear evidence of congressional intent." *Sears, Roebuck,* supra at 183. The Supreme Court of California reversed, holding that the picketing

was arguably protected[3] by the NLRA, 29 USC § 157. The United States Supreme Court reversed this judgment, holding that the "critical inquiry . . . is . . . whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the [']arguably prohibited['] branch of the *Garmon* decision [supra] was designed to avoid." Id. at 197. In *Sears*, the issue appropriate for presentation to the Board would have been that of picketing *per se*; the state issue would have been trespassing on private property, without regard to the nature of the activity being conducted there.

The issue in Count IV of the complaint in the instant case is not as clearly delineated as that in *Sears*. Certainly, the conduct complained of here is of a sort traditionally protected by state tort law, but that fact alone is not enough. See *Linn v. United Plant Guard Workers*, supra at 63. It can be plausibly argued that the conduct, although indisputably *ex delicto* as distinguished from *ex contractu*, is part and parcel of the union activity which commenced with the publication of the "scab letter" — or with the antecedent strike — and therefore is within federal pre-emption. It can be argued with equal plausibility that the allegedly tortious conduct is privately and personally motivated conduct which is only peripherally related to the labor dispute, and which therefore, like almost any other tort claim, is subject to state court jurisdiction. If the former is correct, then we must affirm the trial court on the basis of the stated *ratio decidendi*; if the latter, we must affirm on the principle of "right for any reason," *Tony v. Pollard*, 248 Ga. 86 (281 SE2d 557) (1981), since under the latter theory plaintiff/appellants have stated no tort claim against the named defendants. That is, if the conduct complained of is separate from, or only peripheral to, the protected activity, then the defendants are not McLeod or the local, but the "unnamed John Does" alluded to in the original complaint and named in the depositions and the appellate briefs. McLeod and the local are involved in the allegedly tortious conduct *only* if that conduct was an extension of the federally protected activity occurring in the course of the labor dispute.

In our view, the outcome of the dispositive "critical inquiry," *Sears*, supra at 197, is that the harassing conduct complained of in

---

[3] Whether an activity not expressly protected or prohibited under §§ 157, 158, but "arguably" protected, is subject to the jurisdiction of the state court is a determination to be made in the first instance not by the state courts but by the NLRB. *San Diego Bldg. Trades Council v. Garmon*, supra at 245.

Counts II-IV not only is exactly the same conduct that would have been characterized as an "unfair labor practice," 29 USC § 158, had Cline or Harper taken their claim to the NLRB rather than to the Superior Court, but that it raises the identical issue. Thus "the controversy presented to the state court [would be] identical to that which could have been, but was not, presented to the Labor Board," Id.; and the "state court's exercise of jurisdiction [would] necessarily involve . . . a risk of interference with the unfair labor practice jurisdiction of the Board. . . ." Id. Under the *Sears* test, then, the tort claims set forth here are necessarily subsumed in the claims that should properly have been presented to the NLRB, and the trial court was correct in holding them pre-empted. There is no merit in this enumeration of error.

3. Given the fact situation of the instant case, where the controversy as to Counts I-IV is between the two sisters and their fellow employees and management is not directly involved, the claim of tortious interference with an employment contract is not necessarily within the express coverage of the Act. It may be said "arguably" to fall within the Act's coverage, however, inasmuch as the conduct characterized by plaintiff/appellants as "tortious interference" had its roots in, and arose out of, a labor-management dispute. If the claim is "arguably" within the parameters of the Act, then we would necessarily affirm the trial court's ruling that the claim is pre-empted by federal law.[4]

If it were to be determined, however (and it is the prerogative not of the state courts but of the NLRB to make this determination in the first place), that this activity did *not* "arguably" come within the Act's ambit, we would still be constrained to affirm the judgment on Count II on the "right for any reason" principle, since the allegation fails to state a claim under Georgia law. *Tony v. Pollard*, supra. Inasmuch as during the entire course of events leading up to the filing of the action below, appellants were not discharged but remained in the employ of AT&T, an action for tortious interference with a contract of employment will not lie. See, e.g., *Georgia Power Co. v. Busbin*, 242 Ga. 612 (250 SE2d 442) (1978); *Troy v. Interfinancial*, 171 Ga. App. 763 (320 SE2d 872) (1984); *American Standard v. Jessee*, 150 Ga. App. 663 (258 SE2d 240) (1979).

Appellant's enumeration as to Count II is without merit.

4. Like the claims discussed in Divisions 2 and 3, above, the claim that AT&T failed to maintain a safe workplace might well be regarded as subject to federal pre-emption. In this respect, we fail to perceive the basis for the distinction made by the trial court between

---

[4] See discussion of pre-emption *vel non* in Division 2, above.

the posture of this claim and that of the claims which that court held to be federally pre-empted.

In any event, the denial of summary judgment for AT&T must be reversed. The evidence shows beyond dispute that AT&T management did all that it could reasonably be expected to do to protect Cline and Harper from the allegedly harassing acts, short of posting guards to escort them wherever they might go at the workplace — to lunch, to the rest room, to the parking lot, as well as to their work stations — or, for that matter, to accompany them to and from work and even to remain with them in their homes, presumably stationing themselves near the telephone to intercept harassing calls. The employer cannot reasonably be expected to be an absolute guarantor of a physically or emotionally "safe" workplace; his duty is only that of ordinary care. *Smith v. Ammons*, 228 Ga. 855 (188 SE2d 866) (1972).

Moreover, the "safe workplace" cases cited by appellants Cline and Harper demonstrate that the applicable law, in imposing on the employer the duty to maintain a safe workplace, contemplates "safety" in the physical sense; that is, that the workplace be organized and maintained in such a manner as to minimize the likelihood of physical injury — not (alas!) that it be an utopian place where each employee is guaranteed optimal working conditions and kind, courteous, and supportive treatment at all times by all present. *Walker v. Gen. Motors Corp.*, 152 Ga. App. 526 (263 SE2d 266) (1979). There is no allegation that appellants' physical safety was seriously threatened at any time during the course of the alleged harassment. By Cline's and Harper's own admission, moreover, AT&T made arrangements for harassing telephone calls to be taped; arranged for the "scab letter" to be removed from the bulletin board as soon as it came to management's attention; assisted in cleaning up the vandalized work station; admonished fellow employees to cease sabotaging Cline's and Harper's work; in one instance physically intervened in a situation in which Harper was allegedly being taunted by co-workers; met with employees and union officials to warn them that disciplinary action (up to and including dismissal) would be taken against anyone found to be engaging in harassment; paid to have Harper's damaged car repainted; assigned appellants to other work locations farther removed from the alleged harassers; and took other appropriate and reasonable steps to attempt to put a stop to the alleged harassment.

Under Georgia law, then, we find no genuine issue of material fact as to whether AT&T discharged its duty to Cline and Harper in this respect. As a matter of law, AT&T was entitled to summary judgment on Count V. OCGA § 9-11-56. Under the mandate of either federal or state law, we must remand cases 72598, 72599, 72601, and 72602 to the trial court for entry of summary judgment on this count.

*Judgment affirmed in Case Nos. 72597 and 72600; reversed in*

*Case Nos. 72598, 72599, 72601, and 72602. Benham and Beasley, JJ.,*
*concur.*

APPENDIX A.

**EXHIBIT "A"**

DECIDED SEPTEMBER 16, 1986.

*Albert B. Wallace, Carl A. Adcock*, for Cline & Harper.
*Donald R. Livingston*, for Communication Workers of America.
*William H. Smith, Jr.*, for McLeod.