**Dennis E. DELANEY, Steven J. Roddick, Richard Bartels and Dennis C. Wolter, Appellants,**

v.

**INTERNATIONAL UNION UAW LOCAL NO. 94 OF JOHN DEERE MANUFACTURING COMPANY and Daniel White, Appellees.**

No. 02–1733.

Supreme Court of Iowa.

Feb. 25, 2004.

Charles C. Brown, Jr. of the Law Office of Charles C. Brown, Jr., Ryan, for appellants.

Michael J. Coyle of Fuerste, Carew, Coyle, Juergens & Sudmeier, P.C., Dubuque, for appellees.

STREIT, Justice.

Labor disputes are not for the faint of heart. In a tough campaign at a John Deere plant, four nonunion workers were repeatedly derided as "scabs" and "freeloaders" in the local union's newsletter. They sued the union and its president for defamation, intentional infliction of emotional distress, extortion, and "interference with [their] employment and economic relationship." The four nonunion employees also alleged the defendants violated Iowa's right-to-work law.

The defendants moved for summary judgment. The district court granted the motion and dismissed the entire lawsuit, because, it reasoned, the content of the union's newsletter was constitutionally protected free speech. The plaintiffs appeal. We find federal labor law preempts the plaintiffs' claims and affirm.

## I. Scope of Review

 Our scope of review on appeal from an entry of summary judgment is well-settled:

> We, like the district court, are obliged to view the factual record in the light most favorable to the resisting party, affording that party all reasonable inferences that the record will bear. Summary judgment is proper only if the record made shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. If the conflict in the record concerns only the legal consequences flowing from undisputed facts, entry of summary judgment is proper.... Our review, therefore, is for the correction of errors at law.

*Garofalo v. Lambda Chi Alpha Fraternity,* 616 N.W.2d 647, 649–50 (Iowa 2000) (citations omitted).

## II. Facts and Prior Proceedings

Dennis Delaney, Steven Roddick, Richard Bartels, and Dennis Wolter, the plaintiffs, were hired by John Deere Dubuque Works in 1972, and shortly thereafter joined Local Number 94 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America. Daniel White, a defendant, is president of the local, which

represents all but nine of the nine hundred workers at the plant.

The union was last on strike at John Deere Dubuque Works in 1987. Since then, the union and Deere have entered into several collective bargaining agreements. The plaintiffs maintained nearly continuous,[1] dues-paying membership in the union from hire until after the last relevant agreement. All four plaintiffs also walked the picket line in support of the union.

For various and somewhat vague reasons, the plaintiffs quit the union in 1998 and 1999. Once the plaintiffs left, their names began to appear in the local union newsletter, which contained a "scab list." The scab list named and derided all non-union workers at the plant. The list was usually accompanied by drawings, commonly known as "clip-art," which were bought as part of a commonly sold computer software package.

The record before us contains fifteen editions of the newsletter, which, when read as a whole, demonstrate a concerted effort to persuade the plaintiffs to join the union. This campaign ramped up around "union-won" holidays.

The newsletter's April 1, 1999 edition, for example, referred to the plaintiffs as "freeloaders" who "will also be enjoying the UNION NEGOTIATED 3 day [Easter] weekend." Union members were encouraged to "[r]emember these SCABS for what they are and treat them accordingly." A drawing of a man with a clothespin on his nose, talking on a telephone, and holding a dead rat, accompanied the plaintiffs' names.

---

1. Delaney held a managerial position at John Deere in the 1970s. He rejoined the union upon leaving management in 1979.

We'd like to [picture of bomb] our SCABS

The SCABS will also be enjoying our UNION WON 4TH OF JULY HOLIDAY BENEFIT. They haven't contributed anything or walked the picket line to get this or any other benefit that we have worked for. Remember this when you see them in the plant or on the street! If they would like to be treated any other way we invite them to sign a check-off card!

SCABS:
RICHARD BARTELS, Dept. 163
JOSEPH DECKERT, Dept. 163
DENNIS DELANEY, Dept. 56
STEPHEN HARRIS, Dept. 90
STEVEN RODDICK, Dept. 165
LEE RUEN, Dept. 818
DENNIS WOLTER, Dept. 163

Figure 1

On July 1, 1999, the newsletter listed the plaintiffs' names next to a drawing of a lighted bomb (see Figure 1 above). The newsletter stated:

The SCABS will also be enjoying our UNION WON 4TH OF JULY HOLIDAY BENEFIT. They haven't contributed anything or walked the picket line to get this or any other benefit that we have worked for. Remember this when you see them in the plant or on the street! If they would like to be treated any other way we invite them to sign a check-off card!

The title to this paragraph contained a second lighted bomb. It stated: "We'd like to [picture of bomb] our SCABS."

On September 2, 1999, the newsletter reminded union members

Our SCABS will also be getting our three day UNION WON weekend. They pay no union dues, but they have no problem accepting our benefits. Think of that when you see them at work or on the street.

Next to the plaintiffs' names appeared a drawing containing the following slogan: "and remember SCABS SUCK!"

On November 11, 1999, a drawing of a large rat was placed next to the plaintiffs' names. The newsletter exclaimed

Did you receive your Performance Bonus Payout check recently? This is a UNION WON benefit. Unfortunately, our SCABS also received this payout and DID NOT pay the 1.15% union dues that everyone else did.... Treat them as they should be treated ... with disgust!

On November 23, 1999, the newsletter listed the plaintiffs' names under a drawing of a hatchet-wielding turkey chasing seven rats (there were seven nonunion workers listed below a heading entitled "S-C-A-B-S") (see Figure 2 below). The newsletter pointed out Thanksgiving was a union-won holiday, which the plaintiffs would be enjoying. The newsletter encouraged union members to post the article around the plant and urged nonmembers "to consider joining or reinstating themselves to our ranks."

Two years later, the same drawing of a hatchet-wielding turkey accompanied the plaintiffs' names, along with this paragraph:

It's so easy to forget about our freeloading little rodents when there is so much going on in our world. Just remember ... they are cashing their Performance Bonus checks and enjoying our UNION won holiday without supporting the very group that got it for them. We were taught to turn the other cheek, but in this case they can kiss mine.

Our SCABS will be enjoying this Union negotiated Thanksgiving holiday, too. We do the work and they come around at harvest time.

S -C -A -B -S

Richard Bartels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Dept. 163
Joseph Deckert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Dept. 510
Dennis Delaney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Dept. 90
Stephen Harris . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Dept. 90
Steven Roddick . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Dept. 510
Lee Ruen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Dept. 818
Dennis Wolter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Dept. 510

*Post this article in your area and urge any non-member to consider joining or reinstating themselves to our ranks.*

Figure 2

On January 13, 2000, the newsletter referred to the upcoming Martin Luther King, Jr. holiday as "another UNION WON BENEFIT we have because of the work and sacrifice of DUES PAYING MEMBERS !" The newsletter again encouraged union members to post the article around the plant and join the union.

On September 14, 2000, the newsletter contained the plaintiffs' names under the title "S–C–A–B–S," accompanied by a drawing of a rat being kicked out of the "main gate." The drawing, entitled "A FREE RIDE EVERY SCAB SHOULD GET," appeared with the following passage:

Our SCABS also receive this UNION WON benefit [i.e. a cost of living raise]. They sponge off what every one of us have helped bargain for. PLEASE REMEMBER THIS WHEN YOU SEE THEM IN THE PLANT OR ON THE STREET. Treat them like the leaches they are.

Whatever their excuse is for getting out of the Union, they must feel pretty darn sheepish for taking all our UNION WON benefits (cost-of-living, vacation, holidays, overtime pay, bereavement

pay, health insurance, and the list goes on and on). Or maybe not, since they obviously haven't refused these benefits.

On February 8, 2001, under the title "The Whinin' Nine" and amongst two drawings of baseball players, the plaintiffs' names were listed with five other nonunion members and the following paragraph:

> Did you hear about the new team in town? This team is made up of nine former members of Local 94. They would like to get some new uniforms and equipment, but they don't want to spend any of their own money on it. They thought that maybe the members of Local 94 would like to pay their way. They're used to operating this way. If they can get something for nothing, they're all for it. The *Whinin' Nine*, as they are known around the plant.... If you're tired of carrying these guys, tell them so. I'm sure none of us were taught how to freeload when we were growing up. Maybe all they need is a reminder that we don't appreciate what they're doing.

The plaintiffs filed a lawsuit in the district court against the union and its president in July 2001, claiming defamation, intentional infliction of emotional distress, extortion, "interference with employment and economic relationship," and violation of Iowa's right-to-work law. *See* Iowa Code § 731.4 (2001) (union membership may not be required as a condition of employment). The defendants moved for summary judgment, which the district court granted. Relying, in part, upon *Old Dominion Branch No. 496, National Association of Letter Carriers, AFL–CIO v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("*Letter Carriers*"), the district court ruled the content of the newsletters was protected free speech. The plaintiffs appeal, alleging the district court erred in dismissing its claims.

## III. The Merits

### A. Defamation

■■ Defamation, the sullying of ones good name, "is made up of the twin torts of libel and slander...." *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). Whereas libel is written defamation, slander is oral defamation. *Id.* At issue in this case is libel. We have defined libel as "the 'malicious publication, expressed either in printing or in writing, or by signs or pictures, tending to injure the reputation of another person or to expose [that person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [a] business.'" *Id.* (quoting *Plendl v. Beuttler*, 253 Iowa 259, 262, 111 N.W.2d 669, 670–71 (1961)).

#### 1. *Letter Carriers*

In *Letter Carriers*, the United States Supreme Court addressed whether federal law preempts a nonunion employee's state libel action against a union. In an effort to increase its membership, a local union published a "List of Scabs" in its newsletter. 418 U.S. at 267, 94 S.Ct. at 2773, 41 L.Ed.2d at 752. The scab list contained the names of all letter carriers who refused to join the union. *Id.* On one occasion, the union also reprinted the following "well-known piece of trade union literature, generally attributed to author Jack London":

The Scab

After God had finished the rattlesnake, the toad, and the vampire, He had some awful substance left with which He made a scab.

A scab is a two-legged animal with a corkscrew soul, a water brain, a combination backbone of jelly and glue. Where others have hearts, he carries a tumor of rotten principles.

When a scab comes down the street, men turn their backs and Angels weep in Heaven, and the Devil shuts the gates of hell to keep him out.

*No man (or woman) has a right to scab so long as there is a pool of water to drown his carcass in, or a rope long enough to hang his body with.* Judas was a gentleman compared with a scab. For betraying his Master, he had character enough to hang himself. A scab has not.

Esau sold his birthright for a mess of pottage. Judas sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. The scab sells his birthright, country, his wife, his children and his fellowmen for an unfulfilled promise from his employer.

Esau was a traitor to himself; Judas was a traitor to his God; Benedict Arnold was a traitor to his country; a SCAB is a traitor to his God, his country, his family, and his class.

*Id.* at 268, 94 S.Ct. at 2773, 41 L.Ed.2d at 752–53 (emphasis added). The nonunion letter carriers successfully sued for libel in state court, and the Virginia Supreme Court affirmed on appeal. *Id.* at 269–70, 94 S.Ct. at 2774, 41 L.Ed.2d at 753.

The United States Supreme Court reversed on preemption grounds. *Id.* at 286–87, 94 S.Ct. at 2782, 41 L.Ed.2d at 763. As a threshold matter, the Court held the framework of *Linn v. United Plant Guard Workers of America, Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), governed disputes between nonunion workers and unions over scab lists. *Id.* In *Linn,* a manager at a detective agency alleged a union defamed him; the union had distributed leaflets which, in an attempt to organize the agency's employees, alleged he "robbed" and lied to his employees. 383 U.S. at 56, 86 S.Ct. at 659–60, 15 L.Ed.2d at 586. Balancing the

State's interest in providing its citizens with redress for tortious conduct against Congress' statutorily expressed desire to foster a robust labor debate, the *Linn* Court held federal labor law

did not completely pre-empt the application of state laws to libels published during labor disputes ... *as long as appropriate substantive limitations were imposed to insure that the freedom of speech guaranteed by federal law was protected.*

*Letter Carriers,* 418 U.S. at 271, 94 S.Ct. at 2775, 41 L.Ed.2d at 754 (emphasis added). As a "substantive limitation," the Court in *Linn* "adopt[ed] by analogy"—as opposed to "constitutional compulsion"—the *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), "actual malice" standard for defamation: "libel actions under state law were pre-empted by the federal labor laws to the extent that the State sought to make actionable defamatory statements in labor disputes which were published without knowledge of their falsity or reckless disregard for the truth." *Id.* at 272–73, 94 S.Ct. at 2775, 41 L.Ed.2d at 755.

*Letter Carriers* applied the *Linn* analysis even though *Letter Carriers* did not involve the traditional labor dispute between union and management, but instead a nonunion member's action against a union. The Court reasoned:

Basic to the right guaranteed to employees in § 7 to form, join or assist labor organizations, is the right to engage in concerted activities to persuade other employees to join for their mutual aid and protection ... [including a right] to use all lawful propaganda to enlarge their membership.... [O]ne of the primary reasons for the law's protection of union speech is to insure that union organizers are free to try peacefully to persuade other employees to join the

union without inhibition or restraint. Accordingly, we think that any publication made during the course of union organizing efforts, which is arguably relevant to that organizational activity, is entitled to the protection of *Linn* .... Unions have a legitimate and substantial interest in continuing organizational efforts after recognition. Whether the goal is merely to strengthen or preserve the union's majority, or is to achieve 100% employee membership ... these organizing efforts are equally entitled to the protection of § 7 and § 1 [of the National Labor Relations Act (NLRA),[2] which is codified at 29 U.S.C. section 151 *et seq.*].

*Id.* at 277, 279, 94 S.Ct. at 2778–79, 41 L.Ed.2d at 758, 759 (citations omitted). "[F]ederal policies favor[ ] uninhibited, robust, and wide-open debate in labor disputes...." *Id.* at 273, 94 S.Ct. at 2776, 41 L.Ed.2d at 755.

The Court made clear its decision was based upon federal labor law and the supremacy clause, *not* the First Amendment[3]:

[Although our duty] to insure that the speech involved is not protected under federal law ... has been most often recognized in the context of claims that the expression involved was entitled to First Amendment protection, the same

obligation exists in cases involving speech claimed to be protected under the federal labor laws. This obligation, derived from the *supremacy* of federal labor law over inconsistent state regulation, requires us to determine whether any state libel award arising out the publication of the union newsletter involved here would be inconsistent with the protection for freedom of speech in labor disputes recognized in *Linn.*

*Id.* at 282, 94 S.Ct. at 2780, 41 L.Ed.2d at 760–61 (citations omitted, emphasis added); *see* John P. Ludington, *Defamation: Designation as Scab,* 65 A.L.R.4th 1000, 1002 (1988) (*Letter Carriers* held "the Federal Constitution, under the supremacy clause, precludes a state defamation suit for the use of the word 'scab' if the use of the word was in the course of activity protected by the federal labor laws and if the word was not used with knowledge of its falsity or with reckless disregard for whether it was false or not—the familiar New York Times test.")

Analyzing the plaintiffs' claims, the *Letter Carriers* Court held federal labor law and the supremacy clause protected the union's use of the word "scab," as well as the London reprint. 418 U.S. at 282–87, 94 S.Ct. at 2780–82, 41 L.Ed.2d at 761–63. The Court first pointed out that a "scab" is commonly defined as "one who refuses to

2. Section 7, which is important to Part III.B of this opinion, reads as follows:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C.A. § 157 (1998).

3. In a concurring opinion, Justice Douglas disagreed with the majority's analysis, and concluded the First Amendment, even in the absence of the NLRA or any other manifestation of Congressional intent, would bar the plaintiffs' state tort law claims. *See Letter Carriers,* 418 U.S. at 287, 94 S.Ct. at 2783, 41 L.Ed.2d at 763 (Douglas, J., concurring) ("I do not view the task of reconciling the competing state and federal interests in this area as a difficult one, nor do I view the federal interest as merely a matter of federal labor policy. I think that such expression is constitutionally protected....").

join a union," and because this statement was factually true, it could not serve as the basis of a libel judgment. *Id.* at 282–83, 94 S.Ct. at 2780, 41 L.Ed.2d at 761. Nor did it matter that "scab" is a pejorative term, because

> Vigorous exercise of this right "to persuade other employees to join" must not be stifled by the threat of liability for the overenthusiastic use of rhetoric or the innocent mistake of fact … epithets such as "scab," "unfair," and "liar" are commonplace in these struggles and not so indefensible as to remove them from the protection of § 7, even though the statements are erroneous and defame one of the parties to the dispute.… [F]ederal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point.

*Id.* at 277–78, 283, 94 S.Ct. at 2778, 2781, 41 L.Ed.2d at 758, 761 (citations omitted). In holding the reprint of London's definition of a scab, which referred to the plaintiffs as characterless "traitors" with "rotten principles," was protected speech, the court concluded these characterizations were clearly not "factual statements" but instead

> in a loose, figurative sense [demonstrated] the union's strong disagreement with the views of those workers who oppose unionization. Expression of such opinion, even in the most pejorative terms, is protected under federal labor law.… "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." … Permitting state libel judgments based on publication of this piece of literature would be plainly inconsistent with the union's justifiable reliance on the protection of federal law.

*Id.* at 284, 286, 94 S.Ct. at 2781, 2782, 41 L.Ed.2d at 762–63 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974)).

■ The Court, however, warned "use of this writing or other similar rhetoric in a labor dispute could be actionable, particularly if some of its words were taken out of context in such a way as to convey a false representation of fact." *Id.* at 286, 94 S.Ct. at 2782, 41 L.Ed.2d at 763. That is, a state law defamation claim is *not* preempted if the plaintiffs show the defendant made a false statement of fact with "actual malice," i.e. with a knowing or reckless disregard of the truth. "[I]t must be emphasized that malicious libel enjoys no constitutional protection in any context.… The malicious utterance of defamatory statements in any form cannot be condoned.…" *Linn*, 383 U.S. at 63, 86 S.Ct. at 663, 15 L.Ed.2d at 590. Lower courts have thus permitted state tort actions where there is a false representation of fact and "actual malice" is shown. *See, e.g., Kirk v. Transp. Workers Union of Am., AFL–CIO*, 934 F.Supp. 775, 790 (S.D.Tex.1995) (denying defendants' motion for summary judgment on plaintiffs' defamation claim where plaintiffs generated a genuine issue of material fact as to whether the defendants had falsely accused plaintiffs of appropriating union funds for personal use).

#### 2. Application

■ The parties agree the defendants' use of "scab," standing alone, cannot support the plaintiffs' defamation claim in light of *Letter Carriers*. The plaintiffs are nonunion workers and are therefore "scabs," as that derogatory term is generally understood. *See Letter Carriers*, 418 U.S. at 283, 94 S.Ct. at 2780, 41 L.Ed.2d at 761 ("One of the generally accepted definitions of 'scab' is 'one who refuses to join a

union.'") (citation omitted); *Dunn v. Air Line Pilots Ass'n.*, 193 F.3d 1185, 1193, n. 7 (11th Cir.1999) (same); Webster's Third New International Dictionary 2022 (2002) (same). Federal labor law preempts the plaintiffs' defamation claim, insofar as the latter is based upon factually true assertions that the plaintiffs are "scabs." *Letter Carriers*, 418 U.S. at 283, 94 S.Ct. at 2780, 41 L.Ed.2d at 761; *see also Dunn,* 193 F.3d at 1194–95 (summary judgment properly granted for airline pilots who crossed picket lines because scab list is, in itself, factually true and preempted by federal law); *Cline v. McLeod,* 180 Ga.App. 286, 349 S.E.2d 232, 234–35 (1986) (local union's scab letter protected by NLRA and state defamation claim preempted). Indeed, if nothing more were alleged, the plaintiffs' defamation claim would, at any rate, fail purely on state law grounds. Truth is a complete defense to defamation. *Huegerich v. IBP, Inc.,* 547 N.W.2d 216, 221 (Iowa 1996).

■ Nor are the newsletter's references to the plaintiffs as "freeloaders" actionable. A "freeloader" is defined as one who "impose[s] upon another's generosity ... without sharing in the cost or responsibility involved...." Webster's Third New International Dictionary 906 (2002). Again, this is a crude but true statement about the plaintiffs.

■ The plaintiffs strenuously point out, however, that the newsletter once employed the *past tense* when it characterized the plaintiffs as freeloaders. Namely, the July 1, 1999 edition of the newsletter stated the plaintiffs "haven't contributed anything or walked the picket line to get this or any other benefit that we have worked for," when the plaintiffs *had* in the past paid dues and gone on strike.

This statement, however, cannot be viewed in isolation with a grammar book at one's side. When viewed in context of the newsletter's campaign against the plain-

tiffs, this statement plainly indicates the plaintiffs, as nonunion workers, are not *presently* supporting the union. On two other occasions, the newsletter made clear the plaintiffs used to be members of the union, had quit, and were, therefore, presently "freeloaders," i.e. enjoying union benefits without paying union dues. On September 14, 2000, for example, the newsletter stated

> *Whatever their excuse is for getting out of the Union,* they must feel pretty darn sheepish for taking all our UNION WON benefits....

(Emphasis added.) On February 8, 2001, the following appeared:

> Did you hear about the new team in town? This team is made up of nine *former* members of Local 94.... If you're tired of carrying these guys, tell them so. I'm sure none of us were taught how to *freeload* when we were growing up.

(Emphasis added.) To hold otherwise would ignore the heated nature of labor disputes:

> cases involving speech are to be considered "against the background of a profound ... commitment to the principle that debate ... should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." ... *[T]he most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth.*

*Linn,* 383 U.S. at 62–63, 86 S.Ct. at 663, 15 L.Ed.2d at 590 (quoting *New York Times,* 376 U.S. at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701) (emphasis added). The distinction between the past and present tenses is subtle and easily lost on the reader. The only possible inference which may be deduced here is that the plaintiffs enjoy union benefits even though they do not presently pay dues or otherwise contribute to

the union's efforts to maintain union benefits. Benefits won in the past, of course, are only important to today's union members insofar as those benefits are vigilantly *maintained.* As a matter of law, therefore, we conclude there is no genuine issue of material fact as to whether the defendants made a false statement of fact, with knowing or reckless disregard for the truth in making such statements. Courts ought not become the grammar police and thereby chill free speech in this context. *See Linn,* 383 U.S. at 64, 86 S.Ct. at 664, 15 L.Ed.2d at 591 (refusing to let defamation claims "dampen the ardor of labor debate and truncate the free discussion envisioned by the [NLRA]" or permit lawsuits to "be used as weapons of economic coercion").

■ In a final allegation, the plaintiffs contend the drawings which accompanied the scab lists—unlike the "significantly more peaceful" speech in *Letter Carriers*— "called for physical harm unto others" and therefore escape federal preemption. We disagree. Although the union's statement that "we'd like to [bomb] our scabs" and its depiction of the plaintiffs as rats deserving of the sharp end of a turkey's hatchet are certainly not nice, such hyperbole cannot be used to support the plaintiffs' defamation claim, because this form of speech is merely "loose language" designed to encourage union membership. *See Letter Carriers,* 418 U.S. at 284, 94 S.Ct. at 2781, 41 L.Ed.2d at 762. The drawings of lighted bombs, rats, and hatchet-wielding turkeys resemble cartoons and cannot reasonably be taken at face value. *See Dunn,* 193 F.3d at 1193– 94; *Keller v. Miami Herald Pub. Co.,* 778 F.2d 711, 716 (11th Cir.1985) (plaintiffs' "strictly literal interpretation ignores the nature of a cartoon and how cartoons are traditionally understood by those who view them: 'Such an interpretation does not construe the cartoon as the common mind would understand it but is tortured and

extreme.'" (quoting *Valentine v. C.B.S., Inc.,* 698 F.2d 430, 432 (11th Cir.1983) (per curiam))). The drawings are surely no worse than London's definition of a scab, obliquely referring to hanging and drowning nonunion workers, which the Supreme Court upheld in *Letter Carriers.* Labor disputes are heated affairs, and unfortunately the content of the newsletter is, colloquially speaking, par for the course. *See Linn,* 383 U.S. at 58, 86 S.Ct. at 660– 61, 15 L.Ed.2d at 587. No reasonable reader would think otherwise. *See Greenbelt Coop. Publ'g Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6, 15 (1970) (countenancing reasonable reader approach); *Dunn,* 193 F.3d at 1193 (citing *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 515, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991)) (adopting same). Because cartoons use "hyperbole, exaggeration and caricature to communicate their messages to the reader ... [, o]ne cannot reasonably interpret a cartoon as literally depicting an actual event or situation." *Keller,* 778 F.2d at 716.

We conclude the district court correctly applied *Letter Carriers* to the plaintiffs' defamation claim. With respect to the plaintiffs' defamation claim, the defendants' motion for summary judgment was properly granted. We affirm.

### B. Other State Law Claims

■ Although *Linn* and *Letter Carriers* only involved preemption of state *defamation* claims, the district court granted the defendants' motion for summary judgment on *all* the plaintiffs' state law claims. The court reasoned that since the only complained of behavior was protected free speech, none of these claims could proceed to trial.

On appeal, the plaintiffs do not urge a different analysis. Instead, the plaintiffs' arguments only attempt to show the con-

tent of the newsletters is not protected under the *Letter Carriers* analysis. Because we find the content of the newsletters *is* protected, we affirm the district court's grant of summary judgment against *all* the plaintiffs' state law claims.

As one of our sister state supreme courts has pointed out, the United States Supreme Court

> has "frequently applied traditional preemption principles to find state law barred on the basis of an actual conflict with § 7 [of the NLRA]. If employee conduct is protected under § 7, then state law which interferes with the exercise of these federally protected rights creates an actual conflict and is preempted by direct operation of the Supremacy Clause".... [I]n each case where it has recognized an exception ..., the conduct underlying the action pending in state court was not *protected* by the [NLRA].... [The Court has permitted state tort actions such as trespass to proceed, but p]rior to granting any relief for the trespass, however, the [C]ourt noted the state court would have to decide that the trespass was not *actually* protected by federal law....

*J.A. Croson Co. v. J.A. Guy, Inc.,* 81 Ohio St.3d 346, 691 N.E.2d 655, 662, 663 (Ohio 1998) (quoting *Brown v. Hotel & Rest. Employees & Bartenders Int'l Union Local 54,* 468 U.S. 491, 501, 104 S.Ct. 3179, 3185, 82 L.Ed.2d 373, 383 (1984)) (emphasis in original). In examining the plaintiffs' defamation claim, we have determined, in Part III.A of this opinion, that section 7 of the NLRA protects the content of the newsletters. *See* 29 U.S.C.A. § 157 (codifying the right of employees to form, join, and assist labor organizations). Moreover, all of the plaintiffs' claims are predicated solely upon this protected conduct. "If the state law regulates conduct that is actually protected by federal law ... pre-emption follows ... as a matter of

substantive right." *Croson,* 691 N.E.2d at 664 (citations omitted). It appears, then, the district court rightly granted the defendants' motion for summary judgment on all the plaintiffs' state law claims. *Accord Farmer v. United Bhd. of Carpenters & Joiners of Am., Local 25,* 430 U.S. 290, 305–06, 97 S.Ct. 1056, 1066, 51 L.Ed.2d 338, 353 (1977) (in discussing a state claim for intentional infliction of emotional distress, which it ultimately concluded was not preempted, the Supreme Court stated "The potential for undue interference with federal regulation would be intolerable if state tort recoveries could be based on the type of robust language and clash of strong personalities that may be commonplace in various labor contexts.").

Looking at the matter somewhat differently, one lower federal court reasoned

> preemption analysis requires examining the "substance" of the state law claims rather than their "form." In the first instance, courts consider the defendants' behavior itself and whether this behavior is regulated by federal law, rather than the state cause of action assigned to the behavior.

*Dunn v. Air Line Pilots Ass'n,* 836 F.Supp. 1574, 1579 (S.D.Fla.1993) (citing *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206, 215 (1985)). On this understanding of preemption analysis, although the *form* of the plaintiffs' petition alleges intentional infliction of emotional distress, extortion, interference with contract, and a violation of Iowa's right-to-work law, all four claims are, in *substance,* rooted in a complaint about the defendant's *speech,* as expressed through the union newsletter. No other allegations are made; simply put, the only complaint regards the defendants' protected speech. *See id.; cf. Capital Fund Ltd. P'ship v. Priority Sys., L.L.C.,* 670 N.W.2d 154, 160 (Iowa 2003) (refusing to apply "summary remedy" of forcible entry and

detainer statute to what was, in truth, a contract dispute).

This is not to say such claims could not go forward in all cases. Rather, it is only to say that on these facts the plaintiffs' state law claims cannot stand. To do otherwise would send the plaintiffs' four non-defamation claims back to the district court for a determination as to whether the plaintiffs had a cause of action; assuming, *arguendo*, the plaintiffs could withstand summary judgment in this respect, the court would once again be faced with the issue of whether these state law claims are preempted by federal law—in spite of the fact the plaintiffs allege no other tortious conduct than the speech deemed protected under *Letter Carriers* defamation analysis. Although the plaintiffs' petition may allege the defendants' newsletters amount to intentional infliction of emotional distress, extortion, *etc.*, in truth the only complaint concerns the defendants' protected speech in the newsletters. Once we peer through the plaintiffs' legal characterizations of the wrongs the defendants have allegedly done them, such causes of action clearly cannot stand in light of federal law. The district court's grant of the defendants' motion for summary judgment on the plaintiffs' other state law claims was proper.

## IV. Conclusion

The district court correctly granted summary judgment on the plaintiffs' defamation claim, insofar as it was predicated upon the use of the derogatory terms "scab" and "freeloader," as well as drawings which obliquely refer to violence. The content of the union newsletter is protected speech, and federal law preempts the plaintiffs' state defamation claim. Because we find the content of the newsletters *is* protected, we also affirm the district court's grant of summary judgment against *all* the plaintiffs' other state law claims.

**AFFIRMED.**